HALL, Chief Judge. „
On June 1, 1988, the respondent-appellant, K.G., a 28-year old female, was found to be gravely disabled and was involuntarily committed to the Central Louisiana State Hospital in Pineville. Appellee, LSU Medical Center, petitioned for the commitment of K.G. following her emergency commitment on May 10, 1988. Appellant argues that appellee-petitioner failed to prove by clear and convincing evidence that she was gravely disabled as contemplated by the Mental Health Law, LSA-R.S. 28:1 et. seq. Appellant further argues that if she was properly adjudicated as being gravely disabled, the involuntary commitment to a treatment facility on an in-patient basis is not the least restrictive, yet medically suitable, form of commitment.
I.
On May 10, 1988, K.G. was detained by a police officer at the bus station in Waskom, Texas. She was said to be disoriented and *576 unaware of her identity. The police summoned her father who, along with her mother, drove to Waskom to get his daughter. Paramedics had been called by the police because of their concern that K.G. may need medical care. K.G. refused to get in the car with her parents until ordered to do so by the police. On the way back to Shreveport, where the family lives, K.G. demanded to be let out so that she could walk home. Her father drove to a Shreveport Police Station and requested an officer accompany him to have his daughter admitted to LSU Medical Center for observation. The emergency room physician executed an emergency certificate finding K.G.’s eyes wandered fearfully, her head repetitively swayed, and that she had loose associations and religious preoccupations.
K.G. had been previously hospitalized at LSU Medical Center in 1986 for 72 hours. Immediately thereafter she was hospitalized for three to four weeks at E.A. Conway Memorial Hospital in Monroe. Appellant was confined for approximately two hours at Humana Hospital, Brentwood in Shreveport in the spring of 1988. Finally, on April 27, 1988, K.G. was taken to LSU Medical Center by the police after she allegedly jumped out of a moving vehicle. She was released from that confinement on May 4, 1988.
Dr. Mary Joe Fitz-Gerald, the court appointed psychiatrist who examined and treated K.G. at the medical center, found K.G. to be suffering from a severe personality disorder and to be overly preoccupied with religion. She believed appellant to be psychotic and possibly schizophrenic. Dr. Fitz-Gerald indicated appellant’s behavior was very hostile and uncooperative during her confinement following the April 27th admittance and the May 10th admittance. K.G. has refused to talk with Dr. Fitz-Ger-ald and other resident physicians. On May 14, 1988, K.G. threw the phone and hit a nurse, and she threw water on the staff members the following day. Dr. Fitz-Ger-ald stated the appellant spent most of her time in the bathroom combing her hair or on the telephone, and that her phone privileges had to be restricted.
Dr. Fitz-Gerald prescribed 10 milligrams of Navane for K.G. after she exhibited signs of a severe type of personality disorder or possible signs of schizophrenia. Appellant took the medicine one night, but the following morning she felt faint and her blood pressure was low. Her medicine was changed to Haldol but K.G. has refused to take any more medicine. In 1986 appellant had been treated with Navane for approximately one year under the care of Dr. Paul Ware. This led Dr. Fitz-Gerald to believe the faintness and low blood pressure was not caused by the Navane.
On cross-examination Dr. Fitz-Gerald acknowledged that only on one occasion had K.G. cooperated and conversed with her. Dr. Fitz-Gerald was unable to determine a precise diagnosis due to appellant’s lack of cooperation. Dr. Fitz-Gerald admitted K.G.’s speech was coherent but felt she was covering up hallucinations. Dr. Fitz-Gerald also admitted that K.G.’s mental illness does not interfere with her awareness of her need to eat, her need for adequate clothing, and her need for personal hygiene. However, Dr. Fitz-Gerald was uncertain whether K.G. could provide shelter for herself because she has no plans for her future welfare.
Appellant’s father testified at the commitment hearing concerning his daughter’s condition on the day of her most recent commitment. He indicated that her appearance and facial features were not normal and that she was in a confused state. He stated that she was dressed appropriately and carried a purse and a travel bag. She had taken a cab to Waskom in an attempt to reach Dallas and eventually make her way to Los Angeles. A cab driver showed him a slip which indicated that K.G. had paid him almost $25.00 in cab fare. She had approximately $15.00 cash remaining in her purse. Appellant’s father stated K.G. had been living at home and was supported by her parents until about three months prior to the hearing. Her father did not know where she had been living since she left home nor how she supported herself.
*577 Her father stated that up until about a year ago K.G. had been taking her medicine properly and seeing a therapist on a regular basis. She was enrolled in college and doing well until the spring semester of 1988. That spring, without informing her parents, she dropped two of the three courses she had been taking and was unable to complete the third course due to her commitment.
Dr. Strother Dixon examined K.G. at the request of appellant's counsel. Dr. Dixon evaluated K.G. on May 30th and 31st of 1988 for approximately 50 minutes each day. She performed a mental status examination on K.G., reviewed her chart, and spoke with a nurse on the LSU psychiatric unit. She found the appellant to be alert and cooperative. She knew who she was, where she was, and why she was there. Dr. Dixon noted that K.G. expressed her desire not to be in the hospital and not to take the medication but that she would consent to therapy with a therapist that she, rather than her father, had chosen. K.G. indicated to Dr. Dixon that her father, who has a Ph.D. and is employed at LSU Medical Center, had control over her life and those who had been treating her. She also stated her belief that God has a reason for everything that was done to her and that even though she was going through a lot of pain now that some good was going to come out of this situation. Dr. Dixon stated she found that K.G. showed no signs of being psychotic. However, she admitted some patients can hide their psychosis quite well. It was Dr. Dixon’s opinion that K.G. suffered from a borderline personality disorder but was not in need of involuntary hospitalization in light of her consent to submit to out-patient therapy. K.G. indicated to Dr. Dixon that she had been employed a number of times as a waitress including a job at Piccadilly’s, but she had been unable to hold down a job for any length of time.
Other testimony adduced at the hearing included that of a social worker from LSU Medical Center who verified the correspondence between K.G. and her friend in California. This testimony was offered in an attempt to substantiate and validate K.G.’s desires to travel to California. Additionally, appellant offered the testimony of a friend in Shreveport who was willing to provide K.G. with a place to live when she was released. This friend who had known K.G. for approximately 9 years, was married and had two children. She stated K.G. had previously stayed with her for a few days, and that if K.G. were released, she would encourage her participation in therapy. Finally, K.G. took the stand and expressed her willingness to participate in out-patient therapy with Dr. Brian Can-field, whom she had read about in a newspaper article but had never seen or talked to. K.G. expressed her opinion that she did not need to take medication and her dislike for the doctors who treated her at LSU Medical Center.
II.
To have a person committed to a facility for the care and treatment of a mental disease the district court must find by . .clear and convincing evidence that the respondent is dangerous to self or others or is gravely disabled, as a result of substance abuse or mental illness ...” If the court concludes the commitment is necessary it shall order the respondent committed “.. .to a designated treatment facility which is medically suitable and least restrictive of his liberty.” LSA-R.S. 28:55(E). Matter of L.M.S., 476 So.2d 934 (La.App. 2d Cir.1985); Matter of Scott, 438 So.2d 728 (La.App. 2d Cir.1983); Matter of Commitment of VA, 463 So.2d 998 (La. App. 3d Cir.1985).
In this case there is some evidence that K.G. may be a danger to others. However, the trial court specifically found her to be gravely disabled. Thus, the issue is whether the evidence clearly and convincingly shows that K.G. is “gravely disabled” as a result of mental illness. “Gravely disabled” is defined in LSA-R.S. 28:2(10) as, “...the condition of a person who is unable to provide for his own basic physical needs, such as essential food, *578 clothing, medical care, and shelter, as a result of serious mental illness or substance abuse and is unable to survive safely in freedom or protect himself from serious harm ...” The remainder of the definition concerns incapacitation by alcohol of which we have no evidence in this case.
The medical experts agreed that K.G. has some type of mental illness and needs treatment; the differences of opinion concern the extent of that illness and the required treatment. The trial court justifiably gave greater weight to the opinion of the treating psychiatrist who had observed appellant from the time of her admission to the medical center.
The statute contemplates the commitment of an individual who is “unable to provide for his own basic physical needs ... and unable to survive safely in freedom K.G. has no visible means of support nor does she have any plans for such in the future. She readily admits she has been unable to maintain employment in the past. Although the testimony of Dr. Fitz-Gerald indicates K.G. was aware of her basic physical needs, the record fails to disclose how she can provide for those needs without the aid of her family, who now seeks her commitment. Her past behavior indicates she is in need of treatment on an in-patient basis. Her detention by the police in Was-kom reveals her personality disorder is apparent which would leave her quite vulnerable to the dangers associated with freedom. She denies her problems yet the record reflects her behavior has been successfully stabilized in the past with the benefit of medication. Her refusal to accept treatment and to take the prescribed medication evidences more than mere poor judgment, it indicates her inability to protect herself from serious harm. Her attempt to travel to Dallas, Texas on her way to California by a cab with only $40.00 in cash further establishes the fact that she truly is unaware of how her physical needs are to be met. A review of the record reveals the trial court did not err in finding that petitioners proved by clear and convincing evidence that K.G. was “gravely disabled.”
III.
Appellant further argues that treatment on an out-patient basis should have been ordered because if is less restrictive of her liberty and is medically suitable in this case. K.G.’s history of past hospitalizations with positive results following proper medication, combined with her demonstrated resistance to treatment and current refusal to take prescribed medicine, manifest the need for a more restrictive environment. Dr. Fitz-Gerald testified as to the need for the hospitalization of K.G., and Dr. Dixon acknowledged the need for hospitalization in some cases of personality disorders although she believed K.G. did not need hospitalization. Considering the established need for treatment and the uncertainty that K.G. would accept treatment on an out-patient basis, we find the trial court did not err in ordering an indefinite term of commitment in a hospital.
We note, however, that Dr. Fitz-Gerald believed hospitalization and treatment for about two months should be adequate. The director of the treatment facility and the committing judge are authorized by the statute to discharge the patient, conditionally or unconditionally, or to transfer her to a less restrictive environment. LSA-R.S. 28:56C, G. The statute also provides for review of the commitment by the court issuing the order for commitment after the first sixty days and after one hundred twenty days of commitment and every one hundred eighty days thereafter. The director of the treatment facility is required to issue reports to the court at these intervals. LSA-R.S. 28:56A. The court may at any time order a new hearing. LSA-R.S. 28:56B. As we review this case on appeal more than three months have passed since the commitment. In order to assure that appellant’s situation and status have been reviewed by the director and the district court and appropriate decisions have been or will be made in conformity with the statute, we remand this case to the district *579 court for further review and proceedings in accordance with the Mental Health Law.
IV.
For the reasons assigned, the judgment of the district court is affirmed and the case is remanded to the district court for further review and proceedings consistent with this opinion.
AFFIRMED AND REMANDED.
ON APPLICATION FOR REHEARING
Before HALL, FRED W. JONES, SEXTON, NORRIS and LINDSAY, JJ.
Rehearing denied.