NORRIS, Judge.
Respondent, F.T.E., appeals judgments of judicial commitment and interdiction.[1] For the reasons expressed, we reverse the judicial commitment, modify the judgment of interdiction insofar as it ordered administration over the estate, and remand for further proceedings to ensure that F.T.E.’s *482 current condition is consistent with a judgment of limited interdiction over his person.
FACTS
F.T.E., age 52, suffers from multiple sclerosis, a degenerative neurological disorder. Bedridden for approximately 10 years, he is completely incontinent and cannot bathe or turn in bed without assistance. His ability to hold or dial a telephone is impaired, and he has difficulty seeing to read. However, until these proceedings were filed, he and his mother, who is disabled by Alzheimer’s disease, lived together at his home with the aid of round-the-clock sitters. F.T.E.’s only other close relative is his elder brother, who lives out of state and from whom he had been estranged for several years; Frances Fulgi-um, one of F.T.E.’s sitters, communicated regularly with the brother, although F.T.E. was unaware of this dialog.
F.T.E.'s income is derived from his substantial portfolio of stocks, bonds, and other investment securities, which he successfully managed with the assistance of business and personal agents. Among the latter was Mrs. Fulgium, who worked for F.T.E. and his mother for some six years. In addition to her regular duties as a sitter, Mrs. Fulgium provided clerical assistance for some of F.T.E.’s business matters and was authorized to write checks on both his and his mother’s accounts at F.T.E.’s direction.
F.T.E. denies that he suffers from multiple sclerosis. According to one report, he believes his physical problems are the result of a vitamin deficiency; another witness testified that F.T.E. believes he suffers from osteoarthritis. Expert medical testimony established that this denial, while not unusual, was sufficient to constitute a mental disorder. Dr. Dean Robinson classified F.T.E.’s mental, problem as “mild dementia” secondary to multiple sclerosis. Dementia is a mental disorder in which the patient loses certain faculties for dealing with reality, including the ability to use medication properly. Dr. George Seiden diagnosed F.T.E. as suffering from “organic personality disorder” stemming from multiple sclerosis; he testified that his diagnosis was not inconsistent with dementia, but was more specific to F.T.E.’s behavior. Both psychiatrists agreed that F.T.E.’s mental problem primarily affects only his ability to accept and understand his physical condition.
Several sitters testified that F.T.E. dictated his own treatment and care program while at home. The sitters, though paid from his mother’s account, had little choice but to follow his instructions. Under this regime, F.T.E. ate when and what he chose, took medicine at his discretion, and occasionally even refused to allow his caretakers to clean him until he was ready.
Mrs. Fulgium testified that she and F.T.E. got along well until earlier in the year before these actions were filed; recently he had grown more and more uncooperative and irritable. She expressed concern over several business transactions she felt were questionable. She was also dissatisfied with another sitter, Nelda Linn, who had grown close to F.T.E. and who she felt was trying to “waltz her out” of her position in F.T.E.’s home.
Mrs. Linn testified that F.T.E. cooperated with her efforts to care for him both at home and later at the nursing home. She further stated that the tension between Mrs. Fulgium and F.T.E. became pronounced when he refused to grant Mrs. Fulgium a power of attorney about 10 days before he was removed from his home.
On the morning of April 20, 1990, Mrs. Fulgium took F.T.E.’s mother out of F.T.E.’s home and back to her own apartment. Mrs. Fulgium testified that she took this action because F.T.E. had become angry and verbally abusive toward her. Mrs. Fulgium contacted another sitter to go to F.T.E.’s home.
Left alone, F.T.E. called Mrs. Linn and asked her to bring him breakfast. Mrs. Linn complied. Shortly after she arrived at the house, Mrs. Fulgium returned and told her she was fired. Mrs. Linn testified that F.T.E. told Mrs. Fulgium that she had no authority to fire Mrs. Linn. By this time, Hoyt Tompkins, a long-time friend of F.T.E.’s, had arrived at the house. He told *483 Mrs. Linn to leave, which she did. The following day, F.T.E. called Mrs. Linn and asked her to come to his home; she was denied admittance by another sitter who had been instructed by Mr. Tompkins to keep her out of the house.
On April 23,1990, F.T.E. was involuntarily admitted to Humana Hospital-Brent-wood pursuant to an emergency certificate. La.R.S. 28:53. F.T.E.’s brother sued for interdiction three days later, and subsequently petitioned for judicial commitment on May 7, 1990. F.T.E. was later discharged from Brentwood and transferred to a nursing home facility where he has remained.
A series of hearings held in May and June, 1990 resulted in F.T.E.’s involuntary commitment to the nursing home. In July, a new trial further explored the issues of his present mental condition and whether he could be returned home as a less restrictive measure. Determining that the same disability continued and that the placement remained appropriate, the court entered an oral ruling to that effect on July 18, 1990. This ruling was reduced to written judgment on December 28, 1990.
Hearings on the petition for interdiction were held in September and October. The court deemed total interdiction necessary and signed a judgment to that effect, also on December 28, 1990. F.T.E.’s motion for new trial on both the commitment and the interdiction was subsequently denied.
On appeal, F.T.E. seeks to return to his home under the care of sitters. Specifically, he urges this court to reverse the judicial commitment, arguing that the trial court erred in finding him gravely disabled due to a mental illness; in the alternative, F.T.E. contends that commitment to a nursing home is unnecessarily restrictive. Regarding the judgment of interdiction, F.T.E. argues that the court erred:
1) in finding he is unable to manage his person or his estate and that interdiction was necessary;
2) in finding the least restrictive suitable placement to be the nursing home;
3) in appointing Frances Fulgium as curator of his person and his brother as undercurator of his person and estate; and,
4)in assessing the petitioner’s attorney fees as costs against his estate.
JUDICIAL COMMITMENT
Before a person may be subject to a judgment of civil commitment, the petitioner must show by clear and convincing proof that the respondent is dangerous to himself or to others, or is gravely disabled as a result of mental illness. La.R.S. 28:55 E. Evidence at a commitment proceeding must thus establish at least one of the three statutory grounds for institutionalization. State, in the Matter of A.C., 543 So.2d 133 (La.App. 2d Cir.1989).
The record does not suggest, nor has it been argued that F.T.E. is in any way dangerous to others. Neither is it seriously contended that F.T.E. is dangerous to himself within the meaning of the statute. “Dangerous to self” is defined as behavior, significant threats or inaction which supports a reasonable expectation that there is a substantial risk that the individual will inflict physical or severe emotional harm upon his own person. La. R.S. 28:2(4). The strongest testimony to support such a finding would be Dr. Robinson’s remark that, because of his difficulties in accepting his physical condition, F.T.E. “may be dangerous to himself unintentionally.” R.p. 362. The equivocal, speculative nature of this statement, together with the fact that F.T.E.’s denial of his illness resulted in no significant harm over the ten years he was responsible for his own care, precludes a clear and convincing finding that F.T.E. is dangerous to himself. Dr. Robinson acknowledged, moreover, that F.T.E.’s nursing home chart did not indicate any dangerous behavior, either toward himself or others, that this was his first admission to a psychiatric hospital, and that there was no history of behavior requiring intervention. In fact, Dr. Robinson later testified that the possibility was remote that any serious harmful consequences would result if F.T.E. returned to his home.
*484 The trial court based its order of judicial commitment to the nursing home not on any perception that F.T.E. might be dangerous to himself, but rather on a specific finding that he is gravely disabled as a result of mental illness ensuing from multiple sclerosis. We conclude that the trial court erred in this finding.
To establish that a person is “gravely disabled,” the petitioner must prove two things: (1) the individual is unable to provide for his own basic physical needs, such as essential food, clothing, medical care, and shelter, as a result of serious mental illness or substance abuse, and (2) he is unable to survive safely in freedom or protect himself from serious harm. La.R.S. 28:2(10); Matter of M.M., 552 So.2d 528 (La.App. 2d Cir.1989). A “mentally ill person” is “any person with a psychiatric disorder which has substantial adverse effects on his ability to function and who requires care and treatment.” La.R.S. 28:2(14).
There is no question that F.T.E. is gravely disabled physically. The record does not show, however, that F.T.E. is “gravely disabled” due to a “serious mental illness” rendering him “unable to survive safely in freedom” and requiring “care and treatment.”
Dr. Thomas Reilly, F.T.E.’s treating medical physician at the nursing home, testified that he believed F.T.E. was gravely disabled “in terms of his overall medical, physical and mental capacity.” R.p. 182. This opinion was clearly based on F.T.E.’s general condition, rather than specifically on his mental difficulties. Similarly, Dr. Robinson responded affirmatively when the court asked if F.T.E. would be “better off” in an institutional setting from a “physical long-range outlook.” R.p. 131.
Dr. Robinson assented when petitioner’s counsel asked him, in language tracking the statute, if he thought F.T.E. was “gravely disabled.” However, he further explained that F.T.E.’s mild dementia significantly affected only his perceptions and understanding of his physical condition.
Nor does the record indicate that F.T.E. is “unable to survive safely in freedom.” Dr. Robinson was primarily concerned that if F.T.E. went home supervised only by sitters of his own choosing, he might pressure the sitters into letting him treat his illness in his own way, with possibly harmful results. However, the record shows that F.T.E. was not malnourished or in worse condition than the normal M.S. patient when he was admitted to Brentwood. While there is testimony suggesting that his physical condition seemed to have improved during his stay in the nursing home, it is interesting to note that a decubitus ulcer (bed sore) developed only after he was involuntarily confined to the nursing home, not while he was directing his own personal care at home.
Moreover, there is no persuasive evidence that F.T.E.’s mental infirmity is one requiring the “care and treatment” mentioned in R.S. 28:2(14). Dr. Robinson testified that there was no evidence of psychosis. He further stated that, while F.T.E. consistently refused to take the medication prescribed for him to relieve “anxiety,” his general attitude and level of cooperation with his caregivers nevertheless showed continued improvement without the medication. Dr. Charles Schober, who signed the coroner’s certificate in April and then re-evaluated F.T.E. prior to the commitment hearing, agreed that F.T.E.’s improvement owed nothing to medication. Furthermore, Dr. Robinson testified at the June 1990 hearing that no psychiatric treatment was required and that none had been prescribed for F.T.E. since May, 1990.
A common sense approach dictates that this “mild” dementia or personality disorder, resulting from a physical malady and almost completely limited to denial of that malady, does not constitute the “serious” mental illness contemplated in the statute. See and compare Judicial Commitment of J.M., 560 So.2d 100 (La.App. 3rd Cir.1990); Matter of A.C., supra; Matter of K.G., 531 So.2d 575 (La.App. 2d Cir.1988). Despite occasional “episodes of irritability,” the doctors’ testimony indicates that F.T.E.’s level of cooperation in his physical treatment program has improved. Moreover, F.T.E. had survived “safely in freedom” for some ten years before commencement *485 of these proceedings. F.T.E. can hardly be faulted for displaying anger and irritability when he was uprooted from his home and committed to an institution against his will.
Even though the lower court’s findings are entitled to great weight, an appellate court must, considering the constitutional rights involved, review the evidence presented and strictly require that it meet the high standards enunciated by law. Matter of L.M.S., 476 So.2d 934 (La.App. 2d Cir.1985). We find that the trial court was plainly wrong to find clear and convincing evidence in this record that F.T.E. suffers from a severe mental illness and is unable to survive safely in freedom. He is not “gravely disabled” within the contemplation of the commitment statute. We thus reverse the judgment ordering involuntary commitment.
INTERDICTION
Interdiction has been aptly described as “a pronouncement of civil death without the dubious advantage of an inscription thereof on a tombstone.” Doll v. Doll, 156 So.2d 275, 278 (La.App. 4th Cir. 1963). Because this remedy is so harsh, it must be supported by a showing that the person to be interdicted is mentally incapable of administering his or her estate and unable to take care of his or her person. La.Civ.Code arts. 389, 422; Matter of Fa-bre, 371 So.2d 1322 (La.1979); Interdiction of Dobbins, 535 So.2d 1079 (La.App. 2d Cir.1988), writ denied 536 So.2d 1203 (1989). Some courts have also required a showing that an actual necessity for the interdiction exists. Fabre, supra; In re Adams, 209 So.2d 363 (La.App. 4th Cir.1968) and citations therein. The party petitioning for interdiction bears the burden of establishing the claim. In re Ohanna, 230 La. 384, 88 So.2d 665 (1956). Only upon clear and convincing proof will the remedy be pronounced. In re Adams, supra. A limited interdiction may be imposed when either form of incapacity is proved and where necessity is shown. La.C.C. art. 389.1; In the Matter of Heard, 588 So.2d 799 (La. App. 2d Cir.1991); Interdiction of Goldsmith, 456 So.2d 198 (La.App. 3rd Cir. 1984).
F.T.E.’s conceded inability to physically care for himself justifies total interdiction only if he is also mentally incapable of administering his affairs. Fabre, supra. The record simply will not support a finding that F.T.E. is incapable of administering his estate. Dr. Seiden, the psychiatrist specifically asked to evaluate F.T.E.’s ability to manage his affairs, testified that F.T.E. understood financial dealings, was unlikely to succumb to outside influences and could properly supervise agents to assist him with financial transactions. At the September interdiction hearing, Dr. Robinson admitted that F.T.E. had a good understanding of where his assets were and how the financial process works; the doctor even stated that F.T.E.’s financial acumen was superior to his own. He concluded that F.T.E.’s judgment in financial affairs was not significantly impaired and that he could take care of business with the help of agents.
One investment advisor, Thomas Bullock, testified that he discontinued doing business with F.T.E. several years ago after meeting him at his home because he feared F.T.E. might change his mind about a deal; he admitted, however, that F.T.E. had never actually done so. Bullock also testified that, through the many years they did transact business, F.T.E. made investments at appropriate times, in quality stocks, and seemed to keep up with current stock market data. Another broker, John Edward Zahm, testified that he had worked with F.T.E. for several years and that F.T.E.’s investments had always been sound, and occasionally astute.
F.T.E. expressed considerable concern that he had not been allowed to review his portfolio since his commitment and favored the court with a reasonable discussion of the very transactions which his brother, his friend Mr. Tompkins, and Mrs. Fulgium had characterized so unfavorably.
Contrary to the opinion expressed by Mr. Tompkins, it is not always necessary or even feasible for a potential investor to make personal inspections of property in which he is interested. A person need not *486 be physically capable of attending to business matters to avoid interdiction if he is mentally able to manage his affairs with the assistance of agents, family members or friends. See Pons v. Pons, 137 La. 25, 68 So. 201 (La.1914); Interdiction ofBada-lamenti, 529 So.2d 1376 (La.App. 4th Cir.), writ denied 534 So.2d 444 (1988); Interdiction of Dobbins, supra; Interdiction of Lemmons, 511 So.2d 57 (La.App. 3rd Cir. 1987); Interdiction of Goldsmith, supra. F.T.E.’s holdings, which consist primarily of stocks and bonds, are particularly suited to management through agents. On this record, it appears that F.T.E. is mentally capable of managing his affairs. The trial court thus erred in imposing total interdiction.
However, the trial court was not manifestly erroneous in concluding the evidence was clear and convincing that F.T.E. is incapable of caring for his person. We conclude that a limited interdiction over the person is necessary under the circumstances of this case. La.C.C. 389.1.
The necessity for limited interdiction here arises not from F.T.E.’s conceded physical incapacity, because appropriate staff can meet his physical needs just as agents can assist him with business affairs, but rather from F.T.E.’s inability to accept the fact that he suffers from multiple sclerosis. It is likely, given his history, that F.T.E. would refuse at times to follow his physicians’ treatment plan for his physical problems if left unsupervised or attended only by sitters dependent on him for employment. Medical testimony established that F.T.E.’s sitters should answer to someone other than F.T.E. himself. We agree that the people responsible for F.T.E.’s daily care should have the authority to assure his physical well-being by enforcing the doctors’ orders.
While a limited interdiction of F.T.E.’s person is justified on this record, continued involuntary placement in a nursing facility clearly is not. The court must fashion a judgment of limited interdiction that employs the least restrictive means possible which are consistent with the demonstrated needs of the limited interdict. La.C.C. art. 389.1; Matter of Heard, supra; Interdiction of Goldsmith, supra.
F.T.E. unquestionably wishes to return to his home. The record reflects that F.T.E.’s physical needs can be met at his home with proper staff and equipment. At the commitment hearing, Barbara Brown, Director of Nurses for a home health care service and accepted as an expert in nursing, testified that, “without any doubt,” F.T.E. could be cared for properly at home. R.p. 251. Dr. Schober conceded at the same hearing that F.T.E.’s physical and mental needs could be met at home.
At the interdiction hearing, Dr. Robinson stated that he had no objections to F.T.E.’s release to his home with 24 hour care. Dr. Reilly, who stated in May that F.T.E. could be cared for at home, later retracted that opinion due to the decubitus ulcer which developed while F.T.E. was confined to the nursing home. However, the doctor’s testimony at the interdiction hearing suggests that home care is medically feasible: F.T.E. needs to be turned in bed every two hours; this can be managed with a trapeze bar and one aide. F.T.E. also needs to be helped out of bed and into a geriatric chair periodically; Dr. Reilly felt that two aides could accomplish this.
It is clear that F.T.E. possesses means sufficient to hire sitters and to purchase necessary equipment for his home. Trained sitters, responsible to a limited curator rather than to the patient himself, can ensure that F.T.E. follows doctors’ orders and can immediately advise the supervising physician of any change in F.T.E.’s condition. There is no evidence that such an arrangement would be medically inappropriate.
Petitioners refer to medical testimony indicating that it would be “better” for F.T.E. to remain in the nursing home, or that continued placement there would be “in his best interests.” F.T.E. is not a child. The court is not required to order placement in a setting which doctors consider ideal or which friends and family consider most convenient. A legally appropriate placement is one which is least restrictive of the individual’s personal liberty con *487 sidering his demonstrated needs. La.C.C. art. 389.1. Now only in his middle 50’s, F.T.E. could easily live for many years. He wishesNo do so in his own home, surrounded by the same personal belongings which so offended Mrs. Fulgium’s sense of order. The record demonstrates that his physical needs can be met at home and his right to live there is protected by law.
We therefore modify the judgment of total interdiction and impose a limited interdiction over F.T.E.’s person. We reverse that portion of the judgment appointing a curator and undercurator of F.T.E.’s financial affairs. Recognizing, however, that multiple sclerosis is a progressive disease, and cognizant of the lapse of time since the last hearing on this matter, we remand the case with instructions that the trial court hold an expedited evidentiary hearing to determine if F.T.E.’s ability to manage his affairs has substantially deteriorated and if home care is still medically feasible.
F.T.E. also challenges the appointment of Frances Fulgium as curator, and his brother as undercurator. The trial court has wide discretion to act in the best interest of the interdict in appointing a curator. In re Swett, 286 So.2d 667 (La. App. 2d Cir.1973). There is no indication of any mismanagement on Mrs. Fulgium’s part, and she enjoyed a long association with F.T.E. However, Mrs. Fulgium was instrumental in F.T.E.’s judicial commitment, she continues to oppose home care for him, and she apparently has a serious personality conflict with Mrs. Linn, the sitter whom F.T.E. prefers. As we now decide that the limited interdiction over F.T.E.’s person should be fashioned to permit home care if at all possible, we feel that maintaining Mrs. Fulgium as limited curator over F.T.E.’s person would be inconsistent with his interests. For that reason, we vacate her appointment as curator over the person, and instruct the trial court on remand to appoint a neutral party as limited curator over his person. Given the subordinate role of the undercurator, however, we do not believe that it is inconsistent with F.T.E.’s interests to maintain his brother as limited undercurator over his person.
F.T.E. has also challenged the award of petitioner’s attorney fees from his assets. Although the trial court indicated in its reasons for judgment that attorney fees would be assessed against F.T.E.’s estate, no such award was made in the judgments appealed. Appeal or review lies only from the judgment, not the reasons therefor. Hardin v. Munchies Food Store, 510 So.2d 33 (La.App. 2d Cir.1987), and citations therein. As the record now stands, petitioner’s attorney fees have not been assessed against F.T.E.’s estate, so the issue is not properly before us.
CONCLUSION
For the reasons expressed, we reverse the judgment of judicial commitment. We modify the judgment of interdiction and render a judgment of limited interdiction over the person. The portions of the judgment appointing a curator and undercurator of F.T.E.’s financial affairs are reversed. We remand the case to the trial court for an expedited evidentiary hearing to determine F.T.E.’s current physical and mental condition. Unless the trial court finds that F.T.E.’s physical or mental condition has changed substantially, the court is instructed to fashion a judgment of limited interdiction over F.T.E.’s person which grants the limited curator authority to assure that F.T.E. complies with his physicians’ instructions, to hire and compensate appropriate personnel to care for F.T.E., and to purchase and maintain such equipment as his physicians or a qualified home health care agency deem necessary to make home care feasible.
As we have vacated the appointment of Frances Fulgium as curator of the person, F.T.E.’s current placement shall remain unchanged pending the expedited evidentiary hearing and resulting judgment. After that hearing, the trial court shall appoint an appropriate curator in accordance with the evidence. The court may, in its discretion, maintain F.T.E.’s brother as limited undercurator of the person.
*488 Costs of this appeal are assessed against each party equally.
REVERSED IN PART, MODIFIED AND REMANDED WITH INSTRUCTIONS.
HIGHTOWER, J., dissents and assigns written reasons.
LINDSAY, J., dissents for the reasons assigned in Sections II and III of J. Hightower’s dissenting opinion.

. We have consolidated these two matters for our purposes because of their common nature, because they were treated as consolidated below, and since both were jointly addressed on appeal.