646 So.2d 1052 (1994)
In re Interdiction of Elinor Naberschnig SMITH.
No. 94-CA-262.
Court of Appeal of Louisiana, Fifth Circuit.
November 16, 1994.
Writ Denied February 3, 1995.
*1053 Hugh G. Oliver, Westwego, for appellant Elinor Naberschnig Smith.
Joel A. Levy, Marrero, for petitioner/curatrix Elinor W.Q. Smith.
Before GRISBAUM, GOTHARD and CANNELLA, JJ.
CANNELLA, Judge.
Elinor Naberschnig Smith appeals from a judgment of interdiction and the appointment of her daughter, Elinor W.Q. Smith, as curatrix over her person and estate. We amend, affirm as amended and remand for the appointment of a superintendent.
Appellant is 63 years old. She was born and raised in the Westwego, Louisiana area on a family plantation, now owned by her brother, Richard Naberschnig, and her sister, Nancy Parkerson. Appellant graduated from Louisiana State University in the 1950's with a degree in agriculture. Appellant was married in 1952 and had five daughters. She and her husband moved briefly to Memphis, but eventually returned to the New Orleans area. Appellant and her husband were divorced in 1975 when she was 44 years old. Following the divorce, she resided with her mother on the family plantation. Her mother managed the estate and cared for all of appellant's needs. She remained there with her mother until her mother was placed in a nursing home in 1989. Her mother died in October of 1992. Then, appellant lived briefly with her daughter, Elinor W.Q. Smith, and *1054 also her sister, Nancy Parkerson. She then returned to the family plantation. When the present lawsuit was filed, appellant, with the help of her sister, moved to an apartment in Bridge City, Louisiana.
On October 20, 1992, Elinor W.Q. Smith, appellee, filed a petition to interdict her mother because of degenerative dementia. She asserted that appellant is no longer able to care properly for herself or her property. She also requested to be named curatrix of appellant in the event of the interdiction.
On November 10, 1992 appellant answered the petition denying the allegations. She also asserted a reconventional demand opposing the appointment of appellee as curatrix on the basis of poor business judgment in the event the interdiction was granted.
After various motions, trial was set for November 15, 1993. On November 9, 1993, appellant fell and fractured her arm and dislocated her shoulder. She filed a motion for a continuance of the trial which was denied. The interdiction was tried on November 15, 17, December 9 and 13, 1993. The trial judge then heard evidence on the qualifications and ability of appellee to act as curatrix. On January 1, 1994, he rendered a judgement of interdiction and appointed appellee as curatrix, with another daughter, Mildred Tucker, as undercuratrix.
On appeal, appellant first asserts that the interdiction was improper because only one out of the four mental health experts who evaluated her recommended any action and the action recommended was that she have companion-type assistance. She next asserts that the trial judge erred in relying on only that one expert. Third, appellant contends that the trial judge erred in appointing Elinor W.Q. Smith as curatrix, instead of her sister, Nancy Parkerson, who has been a lifelong companion and because appellant herself appointed her curatrix in a power of attorney executed when the interdiction proceeding was instituted.
Appellant asserts that she is capable of handling her estate and taking care of her person. She cites the testimony of the psychiatrists and psychologists who evaluated her. She contends that the interdiction is a "civil death" and should only be pronounced when the proof is clear and conclusive, citing In re Adams, 209 So.2d 363 (La.App. 4th Cir.1968).
The family members who testified were appellant's daughters, Bonnie Mallett, Mildred Tucker and appellee, along with appellant's brother and sister. According to the testimony, appellant, her brother and her sister are equal shareholders in the family corporation, Francis A. Quinette Realty, Inc. Mr. Naberschnig is the President, appellant is the Vice-President and Mrs. Parkerson is the Secretary/Treasurer. During these proceedings, Mr. Naberschnig filed suit against Mrs. Parkerson for an accounting of the funds that she collected from rentals and which were not deposited into the corporation account. That suit was settled and the settlement was reduced to a consent judgment in November of 1993. The consent judgement ordered Mrs. Parkerson to account for the funds and another realty company was appointed to manage and collect the rent from the Quinette properties. Mr. Naberschnig and Mrs. Parkerson have not been on amicable terms in the last few years.
Appellant's corporate duty is "caretaker" for the plantation. She performs this job by walking the grounds and sweeping the porch. Appellant attends meetings of the corporation and does what she is required to do, according to the direction of her sister and brother. The money collected by the corporation, over and above expenses, is supposed to be divided equally among the three shareholders. Appellant's share is usually between $500 to $1,000 per month, depending on the monthly expenses. Health insurance is also included in the benefits she receives from the corporation.
In addition to the corporate income, appellant receives social security, dividends from stock in Adams Express, Inc., Standard Oil Co., Hunt Wesson Foods and Southern Shell Fish Co. and rental from a home on Moss Street in New Orleans, which she inherited from her father.[1] No specific total income was introduced into evidence.
*1055 The testimony of the family members, as well as the appellant, shows that over her lifetime appellant has held two or three jobs, the last of which was some years before these proceedings. Appellant does not drive. She walks, takes the bus or is given a ride by family members when she needs to go somewhere. Prior to the interdiction proceeding, she visited fairly frequently with at least two of her children, Elinor W. Q. Smith and Mildred Tucker. Elinor resides in Nine Mile Point, Louisiana, near the plantation and Mildred lives in Hineston, Louisiana. The other children live in Thibodeaux, Louisiana (Marsha), Baltimore, Maryland (Lottie) and Alabama (Bonnie). After these proceedings were instituted, appellant moved from the plantation and withheld her whereabouts from her daughters, apparently because either her sister and her attorney told her to avoid them because of the interdiction proceedings, or, she concluded herself that her freedom was in jeopardy. When her daughters found her, she would only visit with them outside the apartment or on the street because she explained that she did not want to cause trouble.
According to her daughters, appellant has never been in full control of her finances and her person. She was cared for by her husband and, after the divorce, by her parents. Her mother took care of appellant's affairs when she was alive. Since then, appellant's sister, Nancy, has kept appellant's money in her purse and appears to have generally taken control of her life. Appellant and her sister, Nancy, agreed somewhat with this testimony, but insisted nevertheless that appellant has handled her finances in the past and is able to continue doing so.
Appellant's appearance was described as clean, but unkempt, by Dr. Fred Sautter, Jr, clinical psychologist. She requires dental work and needs follow up on certain medical problems that she attributed to the change of life which occurred years before. She also has one kidney and has not had regular medical check-ups. It was noted by Dr. Debra DePrato, the court appointed psychiatrist, that appellant did not brush her teeth because she felt that eating fish and milk would take care of any problems. When questioned by her daughters about her dental and medical care, she told them that she did not have the money to pursue dental treatment or medical check-ups, although she does have medical insurance.
In particular, several incidents of concern were referred to by the parties in testimony. While living on the plantation, the gas was turned off and appellant did not inform anyone or seek to remedy the problem. She simply lived with it. Because of that, she was cooking out of a coffee pot given to her by her sister and taking cold baths. This situation arose because the brother and sister apparently thought that the other paid the bill. Notably, no one expected appellant to have paid it. When the problem was noticed, the gas was turned back on by someone, not appellant, but it was not clear who did so.
Another area of concern was appellant's collection of garbage and junk in the room in which she was staying at the plantation. Two photographs depicted that condition. The condition of her present apartment was not known, but in her testimony, she admitted that she liked to collect iron pieces, aluminum cans and other things that she gave to some unnamed person.
The evidence showed that appellant is in the habit of walking along the road to go places. In her years with her ex-husband, she and he raised rabbits and poultry for food. During one of her recent forays, she brought home a rabbit that had been killed by a car and was lying on the road. She cleaned the carcass, cooked it and gave part to one of her cats. Although at trial she denied eating the rabbit, other witnesses said that she told them that she did eat part of the cooked animal.
Appellee testified that her mother has needs that are not being met and that her mother knows her needs, but will not take the initiative to do what is necessary. Appellee said that appellant owns a house on Moss Street that had not been rented for years and which required renovations. Appellee finally made some repairs and procured a *1056 tenant. Following this, for some time after, she collected the rent and put it in an account to be used for the benefit of the property. In 1992, around the time her mother executed the power of attorney to her sister, appellant and Mrs. Parkerson took over collecting the rent.
Appellee testified that she handled the problem with the gas service at the plantation. She noted that the gas had been off for so long it needed a new inspection and repairs and that she contacted the plumber to repair the problem. She testified that her aunt showed up when the work was being done and that someone had the gas turned back on.
Prior to the interdiction proceedings, appellee stated that she and her mother had a good relationship. She said that her mother visited her and that they would go places together. After the proceedings were filed, her mother has been avoiding the children and would not let her into her apartment in Bridge City. Appellee stated that the apartment is in a bad area and is unsafe. She testified that there are junk cars, boarded-up buildings and undesirable people loitering in front of the local quick-stop food store. However, since appellant's move to the apartment, appellee enrolled her in the senior citizen's lunch program and she is picked up, brought to the center for lunch every day and brought home by the center personnel.
Appellee testified that her mother fell and broke her shoulder recently. The evening that it happened she happened to telephone and her mother told her she fell. She did not want appellee's help, but had called her sister who took her to the hospital. When appellee called to check on her mother the next day, her aunt answered the telephone and hung up on her.
According to appellee, her mother tends to collect things. Furthermore, until her mother's death, appellant had been taken care of by her husband and by her mother. Because she was worried about appellant's condition, appellee took her to De Paul Hospital for a mental evaluation in 1990. Appellee stated that appellant behaved strangely from time to time, especially when she was anxious.
In his testimony, Edward Naberschnig stated that the corporate monthly income is approximately $4,900 to $5,000. The corporation has a note for $850 and pays insurance. He said that most of the time, the disposable amount is $4,000, divided equally among the three shareholders. Mr. Naberschnig collects checks which he deposits. He said that the lawsuit against Mrs. Parkerson arose because she collects rents in cash and was not depositing the money in the corporate account.
Mr. Naberschnig testified that he took the photos of appellant's room in the plantation. He said that he was trying to get fire insurance at the time and the Farm Bureau would not insure the house because of the trash collected in appellant's bedroom. The photos showed a collection of garbage piled-up on the floor. Mr. Naberschnig stated that appellant keeps her room that way and that the house is in a disgraceful state.
Carl Perry, the family accountant, also testified. He stated that he had not filed income tax returns for appellant since 1984. He said that he was concerned and sent a letter to her. In February 1993, appellant responded that she wanted her taxes brought up to date and asked him to find out when her last return had been filed. However, he needed a power of attorney to get the information and she refused to give it to him. He testified that her sister had provided the help to do appellant's returns in the past and that appellant was only of minimal help in preparing her returns.
Appellant was examined by several mental health experts. Dr. DePrato was appointed by the court and she referred appellant to Dr. Sautter for psychological testing. Dr. DePrato conducted one and one-half hour interviews with the appellee, Nancy Parkerson and Richard Naberschnig. She interviewed appellant twice for a total of four and one-half hours. By telephone, she also spoke to both attorneys, the family accountant and Mrs. Tucker. She reviewed psychiatric reports from Dr. Sautter, De Paul Hospital and the psychiatrist, Dr. Dennis E. Franklin who examined her there, Dr. Joseph Roniger, a psychiatrist who examined appellant on her request in preparation for trial, a deposition *1057 of Mrs. Parkerson, a letter to the I.R.S. and a letter to her daughter Lottie by appellant.
Dr. DePrato and Dr. Sautter determined that appellant suffers from schizotypal personality disorder. In her report, Dr. DePrato stated that there were no neuropsychological deficits, although testing at DePaul Hospital at one point showed a slightly abnormal E.E.G. and the C.T. showed minimal atrophy in the brain. Her intellectual functioning was well within the average range of intellectual functioning. Dr. DePrato reported that the tests and interviews indicated that appellant has a long-standing personality style characterized by suspiciousness, poor social skills, social anxiety, difficulty communicating, behavioral withdrawal, eccentric behavior and appearance, vague circumstantial communication style and obsessive-compulsive tendencies.
Dr. DePrato noted in testimony and her report that, since the death of her mother, appellant's only close relationship is with her sister. Appellant did not understand the problem between her sister and her daughter, Elinor, but thought her daughters wanted her interest in the corporation. There was a discussion about a male friend from the middle east who apparently sold items of jewelry, blankets and that type of merchandise out of the trunk of his car. According to the testimony of the doctor, the daughters and appellant, she has known the man for a long time, but his visits are erratic. Appellant is in the habit of purchasing some of the items and she apparently had sexual relations with him on occasion. The doctor noted that appellant thought he was a person of great importance because of the way people looked at him.
Dr. DePrato stated that appellant's daily routine was to fix and eat breakfast, listen to the agricultural report on the radio, go to the seniors' citizens facility for lunch, do various tasks and return home before dark. She informed the doctor that she pays her bills in cash because she wrote too many checks. The doctor stated that appellant said that her sister keeps her money in an envelope for her. She was vague and confused about how the corporation profits were realized and distributed, about whether to sell her stock and about her debts to the dentist and doctor. She was not able to explain why she has not followed up on her tax situation.
The doctor testified that appellant likes to collect things such as cans that can be recycled. She explained the incident of the gas being turned off that it was not her responsibility and she thought her daughter was the person who got the gas turned back on.
Concerning appellant's denture problem and her habit of not brushing her teeth because she believed fish and milk would take care of problems, Dr. DePrato stated that appellant does not have a rational understanding of how to take care of herself or what she should be concerned about in regard to her medical condition. The doctor cited the fact that appellant knows her teeth need attention, but felt that she had to wait to finish paying for previous work before she could go back to the dentist. There was no evidence presented in trial as to whether or not appellant's concern about her ability to pay her medical bills was valid. Dr. DePrato stated that appellant mentioned numerous physical complaints, which have never been addressed by a medical doctor.
Dr. DePrato discussed the rabbit incident with appellant, who said that she checked the carcass for bugs, healthiness, age and manner of death. Since it looked alright, she took the rabbit home and stewed it. According to the doctor, appellant gave the entrails to her cat and she ate the meat. However, appellant denied this in her testimony. On cross-examination, Dr. DePrato stated that appellant told her that she grew up eating wild game.
The doctor testified that appellant did not understand why everyone was concerned and felt that she was capable of caring for herself. However, she did not understand the effect of giving a power of attorney to counsel and did not realize it meant he could manage her estate. Dr. DePrato stated that appellant depends on her sister and counsel, who has had a long term attorney relationship with both her and Mrs. Parkerson. The doctor asserted that the sister and attorney have handled appellant's affairs for a long time. In her interview with appellant, it *1058 appeared to the doctor that appellant was not able to grasp the possibility of a conflict between her interests and her sister's interests because she cannot separate the personal from the business relationship.
Dr. DePrato concluded that appellant is able to care for herself and her finances in a supportive environment. However, she needs a primary person to go to for problems and to help her take care of her affairs. She stated that she believed interdiction to be appropriate, but not institutionalization. Dr. DePrato testified that appellant can take care of herself on a daily basis, can live alone, can handle her light bills, etc., but she needs someone to oversee her regular health care, provide transportation, check on her daily and get her involved with more senior activities. The doctor recommended that she have a stress free environment and that she receive follow-up psychiatric care for her personality disorder.
Dr. Sautter testified that he administered the psychological tests that Dr. DePrato relied on as part of her evaluation. He stated that appellant's intelligence level is normal, she did well on the memory tests and she is not suffering from any organic mental illness or disease. He agreed with Dr. DePrato that appellant has a schizotypal personality disorder. Both he and Dr. DePrato stated that she responded well in questioning when the questions were structured, but her answers became loose when the questions were not focused. Both doctors felt she was pleasant, cooperative and likable. Dr. Sautter stated that appellant understood the legal proceedings, but could not explain the break-up of her marriage. She furthermore referred to her marriage as her "first marriage", even though she has only been married once. In an incident at the office, the doctor testified that at one point the psychotechnician administering the tests left the room. When that party returned, she found appellant talking to an empty chair and appellant continued to do so for a few minutes after the technician's return. Her explanation to the technician was vaguely related to something about talking to her mule.
Dr. Sautter testified that appellant is very isolated, which causes peculiar behavior and that she is not socially skilled or able to deal with others. He said that she has a fantasy about the middle eastern man, whom she thinks is very important and might be a sheik. Her ability to communicate is poor and she shows poor judgment about her relationship with her male friend. The doctor stated that appellant is unable to deal with people well, much less unscrupulous ones. He testified that she would be subject to exploitation and manipulation by others. On the other hand, the doctor said that appellant can perform arithmetic and can balance her checkbook, so with structure she can handle her finances. He agreed with Dr. DePrato that she needs a supportive and structured environment. He believed that the pressure from decisions in the management of the corporation would be very damaging to her mental health.
Appellant introduced the testimony of Dr. Thomas Hannie, Jr., a clinical psychologist. Dr. Hannie saw her on two occasions, March 15 and 18 of 1993. He agreed that she suffers from a long-term schizoid personality disorder, and stated that she has paranoid tendencies. The doctor noted that she avoids people, finds the world threatening and feels that others neither accept nor understand her. Dr. Hannie stated that she has poor social skills and is fearful and suspicious.
Dr. Hannie determined that appellant is able to care for herself and her finances. He stated that she appears to use good judgment in protecting her assets. The doctor testified that she is not at risk in giving up or losing those assets, but to the contrary, might fail to take care of herself in order to protect the assets. With assistance, he felt that appellant could exercise good judgment in corporate decisions.
On cross-examination, Dr. Hannie testified that he did not know what her assets were and did not question her about her personal relationships. While he noted her poor denture, he did not question appellant about her medical needs and whether or not she was meeting those needs. He agreed that it would not be in her best interest for appellant to neglect her medical and dental needs.
*1059 Appellant also presented the testimony of Dr. Joseph Roniger, a psychiatrist. Dr. Roniger evaluated appellant on July 5, 1993. Pursuant to his evaluation and prior to the appointment, he reviewed Dr. Hannie's report. Following the evaluation, Dr. Roniger reviewed Dr. Sautter's report.
Dr. Roniger testified that appellant told him that her competency was being questioned because of an inheritance. Dr. Roniger said that appellant clearly understood the questions posed to her and that she answered in an organized, logical, goal-directed manner. Her thinking appeared clear and coherent. Dr. Roniger did not find any hallucinations or delusional thinking. To the contrary, he stated that she presented herself as dependable, straightforward, honest and trustworthy. He noted that she demonstrated excellent impulse control. He concluded that her mental functions were normal for her age and educational background. He did not find any active psychiatric diagnosis and concluded that she should not be interdicted.
On cross-examination, Dr. Roniger stated that he did not speak to any other family member. He performed no tests and evaluated her for one hour. Although, he did not believe that there was any unreasonable risk that she would be taken advantage of, he did not question her about her personal hygiene, her income, where she lived, whether she took proper care of her medical needs or her personal relationships. Dr. Roniger asked her about her daily routine, however, and he agreed that she is a "loner".
Nancy Parkerson testified on her sister's behalf. She stated that she visits appellant several times per week. She stated that she formerly kept appellant's cash because someone had been going through her purse. However, she no longer keeps money for appellant and she submitted an account of the money she held for appellant to Mr. Perry. Mrs. Parkerson testified that appellant is able to manage her finances and that she has a checking and savings account.
Mrs. Parkerson believed that appellant left the plantation because she was being harassed and her new apartment is not in a bad area. She stated that appellant is not reclusive, that she goes out and meets people. She said that she takes appellant to the bank, to the grocery and to collect rent. She does not know the amount of appellant's total income.
Mrs. Parkerson explained that appellant signed the power of attorney to her when the interdiction was filed because she was trying to stop the interdiction. She stated that appellant does not want her children to take over ownership of her property. Mrs. Parkerson testified that appellant wants to manage her property herself and that she is capable of doing so.
Mrs. Parkerson stated that the corporate disbursements were not always divided equally. She explained that the distribution of the income is decided at the meetings. She stated that in 1987 the shareholders passed a resolution which divided the income between Mr. Naberschnig and herself. She was to receive the realty company rentals and he was to receive the income from their tree business. She admitted that she did not always deposit cash rents into the corporate account, but said that she kept an accounting of the cash. Mrs. Parkerson stated that she did not always deposit the cash because it was difficult to write checks to pay corporate bills since her brother was required to sign and it was hard to get his cooperation at times. She further testified that she determines how the expenses are to be paid.
Frank Lagarde, the attorney for Mr. Naberschnig in the corporation dispute, testified. He stated that the case was brought because Mrs. Parkerson would not account for the money she collected. He stated that she also wrote checks to herself without corporate authority. The consent judgment in the case was introduced requiring Mrs. Parkerson to account for the collections and appointing a management company for the corporate realty assets. At this time, Mr. Lagarde stated that Mrs. Parkerson has not accounted, as required by the judgment.
The final witness was appellant. She did not dispute the facts, except that she insisted that she is able to care for herself and her finances. She explained that the room in the photos is full of boxes containing her and her *1060 mother's things and that her gardening equipment is in the corner. She could not explain the trash, but stated that she collected cans and iron pieces. Appellant agreed that she cooked the rabbit killed on the highway, but denied eating it. She stated that she raised rabbits as a food source when she was married.
Appellant stated that when her daughter took her to De Paul Hospital, she thought she was going to see someone about her hot flashes. Because her daughter wanted her to go back, she went another time. She did not seem upset by this, but wanted to please her daughter.
Appellant testified that although her mother helped her with her finances, she herself managed the things that her father left her. She did not state specifically what she had been managing. She agreed that her sister has helped her with the corporation and its decisions. She believes that her brother is now trying to take her corporate finances and power away. Appellant also stated that she gave her sister power of attorney because her daughters are seeking to take over her property and she wanted to maintain control. Her understanding of the interdiction is that she will lose all of her civil rights and everything she owns.
In regard to her medical condition, appellant stated that she has one kidney and has suffered from hot flashes for a long time. She recently fractured her arm and dislocated her shoulder. The latter occurred when she was in the wooded area near her home picking pecans when she tripped over some fence wire and fell across a ditch. Appellant was vague in her explanation as to why she avoided her children after the interdiction. She said they had problems in their own families. She agreed that the dispute between her daughter and sister upset her. Appellant said that appellee offered to help with paying bills, but appellant did not feel she needed help.
Appellant was questioned about the incident with the gas, and said that she did not know why the gas was turned off. She said that when the gas and water stopped working, she just "tried to make it" and pretended she was camping.
Appellant was questioned about her taxes. She stated that although she did not go to Mr. Perry every year, she sent a letter to the Internal Revenue Service in Texas. She did not file the official tax form, but claimed that she declared her income in the letter. A letter was introduced which was addressed to the Louisiana State Income Tax Office and dated May 1991. The contents contained a rambling account of her income. In that letter, she states that she sent a return to the United States Income Tax Service.
Appellant described her relationship with the middle eastern man. She said he is a jeweler and merchandiser who sells thing from his car. Appellant stated that he lives on the Westbank of New Orleans and that she recently bought a tapestry from him for $109. The reason she purchased the item was because he needed money to take a trip back to the middle east for some type of holiday.
The rules governing interdiction are found in C.C. arts. 389 et seq, C.C.P. arts. 4541 et seq, La.R.S. 9:1001 et seq. Interdiction is a harsh remedy and is available upon proof that the person to be interdicted is mentally incapable of administering his or her estate and is unable to take care of his or her person. See: La.C.C. art. 389; Interdiction of F.T.E., 594 So.2d 480, 485 (La.App. 2nd Cir.1992). The party petitioning for the interdiction must prove by clear and convincing evidence that the person to be interdicted is not capable of caring for his or her self and/or finances. See: La.C.C. art 393; Interdiction of F.T.E. at 485; Julius Cohen Jeweler, Inc. v. Succession of Jumonville, 506 So.2d 535, 539 (La.App. 1st Cir. 1987), writ denied 511 So.2d 1155 (La.1987); Interdiction of Lemmons, 511 So.2d 57, 58 (La.App. 3rd Cir.1987); In Re Adams, 209 So.2d 363, 364 (La.App. 4th Cir.1968). Once this is done, the court must appoint a curator (or curatrix), undercurator (or undercuratrix) and a superintendent to oversee the activities of the curator or curatrix. La.C.C. arts. 404, 406, 424. The appointment may be limited in certain cases so as to infringe in the least restrictive manner possible on the rights of the interdict. La.C.C. art. 389.1. In order *1061 to further protect the interests of the person interdicted, the court shall appoint a superintendent whose duty it is to inform the judge, at least once every three months, of the state of the health of the interdicted person, and the manner in which he is treated. La.C.C. art. 424. It is the duty of the trial judge to visit the person interdicted, whenever the information he receives deems it expedient. La.C.C. art. 425.
In this case, the evidence shows that appellant is a pleasant, intelligent woman with a mental disorder, the nature of which interferes with her ability to make proper judgments for her care and to take the initiative to resolve matters which require attention. This is shown by the example that appellant knows that she needs medical and dental care, but does not get it because she thinks she cannot afford the care, although she has medical insurance and there was no evidence that she could not afford to seek medical and dental treatment. Further, she knows she must file income tax, but does not understand the proper procedure and has refused to allow her accountant to pursue the matter.
Appellant collects trash, which according to the photographs, involves more than recyclable items or storage boxes for her and her mother's things. The plantation where she was living prior to the interdiction is a fire danger because of the trash. In addition, the evidence shows she lacks understanding about the conflicts in the family and the people with which she associates, making her subject to exploitation and manipulation. Thus, after reviewing the evidence, we find that the trial judge did not err in interdicting appellant. However, the evidence also shows that with supportive supervision she can function well.
In his oral decision rendered from the bench, the trial judge stated that the interdiction should be carried out with the least restrictions possible. We agree with this statement, but because it was not included in the written judgement, we will amend the judgment to so state.
The trial judge appointed appellee as curatrix and appellant's daughter, Mildred, as undercuratrix. Appellant asserts that the trial judge erred in this respect because appellee has not shown good business judgment.
In the hearing directly following the trial on the interdiction, appellee testified that she is 44 years old, divorced and has children. She works for Chevron in New Orleans in computer support. She has a master's degree in science.
Appellee testified that she will tend to the medical and dental needs of her mother, take care of the insurance, see that her tax returns are filed and get her involved in more senior citizens programs. Appellee was particularly interested in following up on the state of her mother's shoulder and arm. Appellee further stated she will pursue mental health therapy for her mother and will find her a safe place to live near to the home of appellee. Appellee noted that she lives close to the plantation and her mother would be able to visit her and the plantation. In regard to the corporation, the appellee testified that she will represent her mother's interest.
On cross-examination appellee was questioned about a real estate transaction. In that matter, she sold her house to her fiance and later returned his money and she got the house back. She admitted that the transaction was not good business, but stated that it was an emotional matter.
The trial judge has great discretion to act in the best interest of the interdict in appointing a curator. In Re Interdiction of Thomas, 535 So.2d 1315, 1316 (La.App. 5th Cir.1988). Although we recognize that appellant appointed her sister curator in the event of an interdiction, the evidence also shows that she does not understand the effect of the appointment. Furthermore, the evidence shows that appellee is capable and has her mother's best interest in mind. Consequently, we find that the trial judge did not abuse his discretion in appointing appellee as curator and Mildred Tucker as undercurator.
Finally, we note that the trial judge neglected to appoint a superintendent as required by La.C.C. art. 424. Thus, we will remand the case for an appointment of a neutral party to act as superintendent.
*1062 Accordingly, the judgment of interdiction is hereby amended to state that the curator is to carry out her duties with as little intrusion as possible on the privacy of the interdict. Further, the case is remanded for appointment of the superintendent. The judgment is otherwise affirmed.
Costs of the proceedings are to be paid from the estate of the interdict, per La. C.C.P. art. 4551.
AMENDED, AND AFFIRMED AS AMENDED, REMANDED.
NOTES
[1] The evidence was vague as to her total income. The rental income is approximately $350 per month, without considering expenses. The stock income is unknown.