702 So.2d 938 (1997)
INTERDICTION OF Ermon Ray CORNWELL, Plaintiff-Appellee,
v.
Ermon Ray CORNWELL, Defendant-Appellant.
No. 97-425.
Court of Appeal of Louisiana, Third Circuit.
October 15, 1997.
*939 Mark L. Talley, Jena, for Ermon Ray Cornwell.
Walter E. Dorroh, Jr., Jena, for Barbara Germany, et al.
Before SAUNDERS, WOODARD and GREMILLION, JJ.
GREMILLION, Judge.
The defendant, Ermon Ray Cornwell, appeals a judgment of the trial court ordering his interdiction. For the reasons which follow, we modify the judgment of interdiction insofar as it orders administration over Cornwell's estate, and remand for further proceedings to ensure that the interdiction employs the least restrictive means possible and to have the trial court reassess Cornwell's current condition and the appointment of his grandson and daughter as curator and under-curatrix.

*940 FACTS
Barbara Germany, Janis R. Andrieu, and Sue Harmon, Cornwell's daughters, filed a petition seeking his interdiction, alleging that due to age, infirmity, and mental illness he was unable to manage his property, business affairs, and person. On the date the petition was filed, Cornwell was, pursuant to a judicial commitment proceeding, residing at the Gero-psych Unit at the Rapides Medical Center in Alexandria, Louisiana. Following his release from that unit, Cornwell was placed at the Tioga Manor Nursing Home, where he remains.
Following a hearing on September 16, 1996, the trial court ordered Cornwell interdicted finding that, as a result of his mental infirmity, he was unable to care for his person or administer his estate. In addition to naming a curator and under-curatrix, the trial court ordered the continuation of the judicial commitment. A written judgment was issued on October 9, 1996. It is from this judgment that Cornwell appeals.

ISSUES
On appeal, Cornwell argues that the trial court erred in finding that the evidence supported his interdiction.

LAW
The codal pronouncements dealing with interdiction are as follows:
La.Civ.Code art. 389:
No person above the age of majority, who is subject to an habitual state of imbecility, insanity or madness, shall be allowed to take care of his own person and administer his estate, although such person shall, at times, appear to have the possession of his reason.
La.Civ.Code art. 393:
The acts of imbecility, insanity or madness must be proved to the satisfaction of the judge, that he may be enabled to pronounce the interdiction, and this proof may be established as well by written as by parol evidence; and the judge may, moreover, interrogate, or cause to be interrogated by any other person commissioned by him for that purpose, the person whose interdiction is petitioned for, or cause such person to be examined by physicians or other skillful persons, in order to obtain their report, upon oath, on the real situation of him who is stated to be of unsound mind.
La.Civ.Code art. 422:
Not only lunatics and idiots are liable to be interdicted, but likewise all persons who, owing to any infirmity, are incapable of taking care of their persons and administering their estates.
Such person shall be placed under the care of a curator, who shall be appointed and shall administer in conformity with the rules contained in the present chapter.
In order to have a person fully interdicted, the party petitioning for the interdiction must prove, by clear and convincing evidence, that the person to be interdicted is mentally incapable of administering his estate and that he is unable to care for his person. Interdiction of Lemmons, 511 So.2d 57 (La.App. 3 Cir.1987). The party must also prove the necessity of the interdiction. In Re Adams, 209 So.2d 363 (La.App. 4 Cir.1968). Interdiction is so harsh a remedy that it has been described as "a pronouncement of civil death without the dubious advantage of an inscription thereof on a tombstone." Doll v. Doll, 156 So.2d 275, 278 (La.App. 4 Cir.1963). Since it is so harsh, interdiction may not be used as a matter of convenience, hence the stiff burden of proof. Interdiction of Lemmons, 511 So.2d 57. Since the determination of whether to order interdiction is a finding of fact, we will not set aside the trial court's finding in the absence of manifest error or a clearly wrong determination. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993).
In oral reasons, the trial court held that the expert testimony established that Cornwell was suffering from two conditions, bipolar disorder (manic depressive) and dementia. It found that the bipolar disorder was a mental disease which affected Cornwell's ability to function rationally in society and that, absent his medication, he did not have the ability to act appropriately. The trial court further found that Cornwell's dementia was a physical infirmity which was irreversible, *941 and that it was the probable cause of his short-term memory loss. Based on these two conditions, the trial court ordered Cornwell interdicted. The trial court further held that the previous judicial commitment confining Cornwell to the Tioga Manor Nursing Home would not be disturbed.
Testimony was presented by two expert witnesses, Drs. Hugh King and Milton Rhea. Both doctors testified that Cornwell was suffering from a bipolar disorder and dementia and each agreed that due to his condition he was incapable of managing either his affairs or his person, and that he should be interdicted.
Dr. King, a psychiatrist, evaluated Cornwell from February 24 through April 3, 1996, while he was in the Rapides General Hospital pursuant to the judicial commitment. When Cornwell was released to a secure nursing home on April 3, 1996, Dr. King felt that he was incapable of managing his affairs and that someone should be appointed to do so for him. He next evaluated Cornwell on September 9, 1996, prior to the trial. At that time, Dr. King was of the opinion that Cornwell's condition was basically the same. He reported that Cornwell did not believe that he had a mental disorder or that he needed to take psychiatric medication. He stated that Cornwell wished to leave the nursing home in order to manage his own funds. Again, Dr. King felt that as a result of his mental condition, Cornwell was not capable of doing so.
Dr. King's main concern was the bipolar condition, which he described as a significant mental disorder which is exhibited through mood swings, periods of irritability, increased motor activity, poor judgment, impaired concentration, and possible difficulty in sleeping. He stated that Cornwell's unkempt appearance and his actions of making threats to kill or injure others, disrupting business by monopolizing an employee, and confusion over simple account statements were consistent with that disorder. Dr. King testified that most cases of bipolar disorder can be controlled with medication as long as the patient is willing to admit that he has a problem and continues taking his medication. Although Cornwell was taking his medication at the nursing home, Dr. King could not guarantee that he would continue to do so if he was released. In fact, Cornwell told Dr. King that there was nothing wrong with him and that he did not intend to take his medication. If Cornwell stopped taking his medication, Dr. King stated that he would become increasingly irritable, irrational, and lacking in judgment. Dr. King also noted that Cornwell was suffering from dementia, which he attributed to the constriction of the small blood vessels in the brain possibly caused by smoking. This condition caused Cornwell difficulty with his memory and orientation in recall on admission. Dr. King felt that this condition would continue to worsen with time if Cornwell continued smoking.
Dr. Rhea, a psychologist, also evaluated Cornwell both while he was in the Rapides General Hospital and prior to trial. In his report of September 11, 1996, Dr. Rhea found Cornwell's condition unchanged from his previous evaluation, in that he still exhibited signs of a bipolar disorder and dementia. Dr. Rhea agreed with Dr. King's assessment that Cornwell would not do well outside of a structured environment because he would discontinue taking his medication. Dr. Rhea based this in part on the fact that Cornwell did not feel as though he had acted inappropriately in the past. He admitted to Dr. Rhea that he harbored homicidal ideas towards his son-in-law and others, and he consistently felt that others were unfair to him.
Testimony was also heard from Phillip Henry, Cornwell's pharmacist, and Gayla Warren, the loan administrator for Sabine State Bank, that Cornwell's personal hygiene had deteriorated in the months prior to his judicial commitment. Germany testified that her father was neither eating nor sleeping properly, and that he was constantly agitated and talking. Both Germany and her son, Robert Hagan, testified that Cornwell refused to take his medication when he was released from the nursing home to attend his wife's funeral. Jackie Richardson, the vice-president of the Sabine State Bank, and Warren both testified that Cornwell's memory had deteriorated prior to his commitment. Richardson testified that Cornwell would go daily to the bank to transact business and, *942 that in the month prior to his commitment, he would come two or three times a day. She stated that he had trouble remembering what he had done the day before. Richardson also testified that Cornwell was using his certificates of deposit as collateral to borrow money in order to purchase mortgages. She stated that she tried to tell him that the interest rate he was borrowing at was too high, two percent above the interest rate on his certificates of deposit, but he refused to listen to her. Richardson did admit that Cornwell had done this through the years and that he knew what he was doing. She even admitted that he knew financial matters very well. However, she indicated that she did not feel the transaction was very profitable for him. Marilyn Crooks, who worked for the Cornwells for a couple of months, testified that Cornwell had trouble distinguishing between the various denominations of currency.
David Lewis, the administrator of the Tioga Manor Nursing Home, testified that he had heard no complaints from any of his staff at the nursing home pertaining to Cornwell. He stated that Cornwell was alert to time, place, and situation, and that he had never attempted to flee from the premises of the nursing home. He testified that Cornwell was always well groomed, other than sometimes being unshaved, and that he never had to be forced to bathe or take his medication. Lewis testified that Cornwell talked to him every morning, and that he read the newspaper daily to check on thirty year mortgages, interest rates, and treasury bills. He stated that Cornwell understood that if the T-bill rates were up, then he was making money, but, if they were down, he was losing money.
Sharon Lowery, Tioga Manor's director of nursing, testified that Cornwell recognized her and others at the nursing home, and remembered their names. She described him as cooperative, ambulatory, able to feed and bathe himself, and needing minimal assistance. She stated that he received his medication daily from the nurses, which he always took voluntarily. Lowery testified that Cornwell never threatened anyone or attempted to leave the premises. She stated that his condition had improved since he was admitted to the nursing home.
Bess Addington and Cynthia Brown, Tioga Manor's assistant director of nurses and the social worker, respectively, both testified that Cornwell was alert, oriented, cooperative, and nonthreatening. They both stated that he had never attempted to flee the nursing home, and Addington testified that he voluntarily took his medication.
Dixie Wilson, Cornwell's cousin, testified that he visited Cornwell prior to and following his placement in the nursing home. Wilson stated that he was never concerned with Cornwell's ability to communicate prior to his entering the nursing home. He stated that Cornwell indicated to him one time that he was "at the end of his rope" as a result of caring for his wife. He further testified that from 1992 through the present, Cornwell never behaved in an inappropriate manner, threatened him or his family, or ever appeared ungroomed. Since Cornwell was placed in the nursing home, Wilson stated that either he or his son checked on him at least once a month. Wilson admitted that Cornwell had improved physically by gaining weight since entering the nursing home. He further stated that he thought Cornwell had improved to the point that he could think straight and was not stressed out anymore. Wilson testified that he remembered Cornwell getting up out of a meeting with him in order to take his medication. When questioned as to how often he visited Cornwell, Wilson stated that he did not visit him regularly.
After reviewing the trial court's oral reasons, we find that it based its order of interdiction solely on Cornwell's inability to physically care for his person. While we agree with the trial court that sufficient evidence was presented to prove that incapacity, that alone, without evidence of an incapacity to administer his estate, is insufficient to order a full interdiction. Thus, the trial court erred as a matter of law in ordering a full interdiction. More appropriately, we find that the trial court should have ordered *943 a limited interdiction pursuant to La.Civ. Code art. 389.1.
Article 389.1 provides:
When a person is declared incapable by reason of mental retardation, mental disability, or other infirmity under the provisions of Articles 389 or 422 of the Louisiana Civil Code, of caring for his own person or of administering his estate, a court of competent jurisdiction may appoint a limited curator to such person or his estate. Pending appointment of a limited curator, the court shall inquire into the specific abilities and disabilities of the incapacitated person and such limited curator shall have only those powers necessary to provide for the demonstrated needs of the incapacitated person. The powers, duties, responsibilities, and any liabilities of the limited curator shall be specifically set forth in a judgment of limited interdiction.
The rights of the limited interdict shall be infringed in the least restricted manner consistent with his incapacities. A judgment of limited interdiction shall not operate to deprive the incapacitated person of any civil right, the right to contract, or any right pertaining to any license, permit, privilege, or benefit unless specifically set forth in the judgment.
A limited interdiction is proper when either form of incapacity is proven and necessity is shown. Interdiction of F.T. E., 594 So.2d 480 (La.App. 2 Cir.1992); Interdiction of Goldsmith, 456 So.2d 198 (La.App. 3 Cir. 1984).
We find that the record contains insufficient evidence to prove that Cornwell was incapable of administering his estate. Richardson's testimony does not convince us that Cornwell is incapable of handling his financial affairs. Her opinion that his business transactions were not very profitable does not satisfy the clear and convincing burden of proof, especially in view of her testimony that he had done the same thing for years and that he was very knowledgeable about financial matters. Lewis testified that Cornwell discussed the interest rates every morning and was aware of the effect they had on his financial investments. Even though Dr. King testified that Cornwell would become increasingly lacking in judgment if he discontinued taking his medication, he did admit that the bipolar disorder could be controlled with medication. In view of our discussion below, we find that the trial court erred in finding Cornwell incapable of administering his estate.
With regards to Cornwell's ability to care for his person, we feel that the need for a limited interdiction arises solely from his refusal to accept the fact that he suffers from a mental disorder which necessitates the need for medication. Cornwell told Dr. King seven days prior to the hearing that he did not believe he suffered from a mental condition and that he would not take his medication when released. Although the nursing home's staff testified that Cornwell was taking his medication voluntarily, we find the evidence clear and convincing that he will not do so if he is released without supervision, as was borne out by his own recent statements to Dr. King and his actions while attending his wife's funeral.
We, therefore, remand and order the trial court to conduct an expedited hearing and fashion a judgment of limited interdiction pursuant to La.Civ.Code art. 389.1 that employs the least restrictive means possible which are consistent with the demonstrated needs of the limited interdict. Whether or not Cornwell should be released from the nursing home depends upon whether he will continue taking his medication. Since Cornwell has already stated that he will not take his medication, we feel that this matter should be remanded to the trial court for determination of a plan that, if possible, allows Cornwell to leave the nursing home while maintaining supervision of him to ensure that he takes his medication. We also feel that continued supervision of Cornwell is necessary to monitor his health and behavior, thus, we order the trial court to appoint a superintendent, as required by La.Civ.Code art. 424.
Finally, we instruct the trial court to reassess its appointment of Hagan and Germany as curator and under-curatrix. There is no indication of any mismanagement *944 on the part of the curator and under-curatrix, and they apparently feel they are acting in Cornwell's best interests. However, they were instrumental in Cornwell's judicial commitment and interdiction, and were apparently unable to convince him to take his medication while he was away from the nursing home attending his wife's funeral. It appears from the testimony that Cornwell and curators harbor ill-will toward each other which seemingly creates friction between them. We are concerned that because of that ill-will or friction, the curators may not be successful in making him take his medication. While we recognize that the trial court has great discretion to act in the best interest of the interdict in appointing a curator and under-curator, we feel that the trial court should revisit this issue in case it finds that Cornwell harbors ill feelings towards Hagan and Germany to the extent that it would adversely effect his limited interdiction. In re Smith, 94-262 (La.App. 5 Cir. 11/16/94); 646 So.2d 1052, writ denied, 94-2996 (La.2/3/95); 649 So.2d 407. In so doing, it is our opinion that it would be appropriate to consider Cornwell's own testimony and give it significant weight in determining who should be his curator and under-curator in his limited interdiction. If the trial court feels that Cornwell may respond more favorably towards his interdiction, particularly the taking of his medication, if another curator and under-curator were appointed, then it is in Cornwell's best interest to do so.

CONCLUSION
For the foregoing reasons, the judgment of the trial court ordering Ermon Ray Cornwell interdicted is reversed and the matter is remanded for further proceedings consistent with this opinion. The costs of this matter are to be paid from the estate of the interdict. La.Code Civ.P. art. 4551.
REVERSED AND REMANDED.