INTERDICTION OF CARROLL LEBLANC
CONSTANCE

NO. 23-CA-318

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 810-004, DIVISION "O"
HONORABLE DANYELLE M. TAYLOR, JUDGE PRESIDING

March 22, 2024

**FREDERICKA HOMBERG WICKER**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Marc E. Johnson

**JUDGMENT OF FULL INTERDICTION REVERSED; JUDGMENT OF**
**LIMITED INTERDICTION RENDERED; REMANDED WITH**
**INSTRUCTIONS**
    **FHW**
    **JGG**
    **MEJ**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
GERARD R. CONSTANCE
        Vincent F. Wynne, Jr.
        Shannon K. Lowry
        R. Gary Higgins, Jr.
        Whitney H. Germany

COUNSEL FOR DEFENDANT/APPELLANT,
CARROLL LEBLANC CONSTANCE
        Randall A. Smith
        Dylan T. Leach

AMICUS CURIAE,
LOUISIANA GUARDIANSHIP SERVICES, INC.
        Colin Leonard
        Jason D. Asbill
        Jennifer C. Deasy

**WICKER, J.**

In this interdiction proceeding, appellant, Carroll Leblanc Constance ("Mrs. Constance"), seeks review of the trial court judgment ordering her full interdiction pursuant to La. C.C. art. 389. For the following reasons, we find the trial court correctly determined a need for interdiction as to Mrs. Constance's legal, financial, and medical affairs, and correctly appointed an independent entity to serve as curator, but erred in imposing a full interdiction under La. C.C. art. 389. We therefore reverse the judgment of full interdiction and render a judgment of limited interdiction under La. C.C. art. 390, limiting the interdiction to Mrs. Constance's legal, financial, and medical affairs. For the reasons provided below, we further remand this matter to the trial court for further proceedings as outlined herein.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 8, 2020, Gerard Constance ("Gerard") filed a "Petition for Full Interdiction and Appointment of a Curator," alleging that his mother, Mrs. Constance, was "fully incapable of taking care of her person and administering her estate," and seeking a full interdiction pursuant to La. C.C. art. 389. The petition sought to have petitioner, Gerard, appointed as Mrs. Constance's curator and Mrs. Constance's granddaughter, Kellie Vaccaro ("Kellie"), appointed undercurator. The trial court executed an ex parte order issuing letters of curatorship to Gerard and appointing Kellie as undercurator.[1] Mrs. Constance thereafter filed an "Emergency Motion to Vacate Order and Revoke Provisional Letters of Curatorship," which was set for hearing on November 10, 2020.

On October 5, 2020, Gerard filed a "First Supplemental and Amending Petition," alleging that Mrs. Constance had recently threatened to commit suicide

---

[1] The order further stayed all other powers of attorney issued by Mrs. Constance to any other individuals, save an August 2020 power of attorney issued in favor of Gerard.

and seeking the court's appointment of a neuropsychiatrist to evaluate Mrs. Constance's alleged emerging dementia or Alzheimer's condition.

On November 10, 2020, pursuant to the parties' stipulation, the trial court issued a judgment granting Mrs. Constance's emergency motion to revoke the provisional letters of curatorship and further appointing Dr. Kevin Bianchini to conduct a neuropsychological evaluation.[2]

Kimberly Constance ("Kimberly"), Mrs. Constance's daughter, filed a "Petition for Intervention," seeking to have the petition for interdiction dismissed and alleging that an interdiction is improper and unnecessary as Mrs. Constance is able to consistently make and/or communicate reasoned decisions regarding the care of her person and property. In her petition for intervention, Kimberly sought to have the petition for interdiction dismissed or, alternatively, prayed for a limited interdiction and/or her appointment as curatrix.[3]

The matter proceeded to trial on December 7, 2022. The evidence at trial demonstrated that Mrs. Constance and her husband were married for approximately 50 years and that her husband passed away in January 2020 after an ICU hospital admission. At trial, Gerard, Mrs. Constance's son, testified that he and his parents had a close relationship throughout his life. He stated he and his father owned a construction company together, Construction by Constance, until approximately one year before his father's death. Prior to his father's death, Gerard worked for his father part-time by managing the family's rental properties. He testified that his mother had never helped manage the rental properties, and she was a stay-at-home mom and worked as a substitute teacher.

---

[2] The stipulated judgment also provided that Gerard would continue to collect rent money from Mrs. Constance's rental properties but he would deposit the funds into an account separate from his own funds and would keep an accounting of any funds collected and any expenses related to the rental properties. It also ordered Gerard to return an $80,000.00 cashier's check to Mrs. Constance.

[3] Kimberly attached a December 22, 2020 "Durable Medical Power of Attorney" and a December 22, 2020 "Power of Attorney."

Gerard testified that, shortly before his father's death, his father confided in him that he had noticed Mrs. Constance experiencing memory issues. Gerard further testified that, as early as December of 2019, immediately preceding his father's death, he also noticed his mother having difficulty remembering things. Specifically, he testified that his mother would occasionally babysit his daughter and he noticed that she could not recall, on one occasion, information he had relayed to her about his daughter's homework assignments. He further testified that, on one occasion, his mother cooked spaghetti for dinner for his daughter, and his daughter reported it did not taste the same because Mrs. Constance allegedly forgot to add certain ingredients. Gerard further described an incident during which he claims his mother did not remember introducing herself to one of the properties' tenants. He further testified that on a few occasions, he noticed some "dings" on Mrs. Constance's car and became concerned about her driving abilities.

Shortly after his father's death, Gerard suggested to his mother that she visit with a therapist to process her grief. Gerard explained that Mrs. Constance's primary care provider, Dr. Sara Fernandez, informed him that Mrs. Constance should not be left alone at any time. He also suggested that Mrs. Constance be evaluated for her forgetfulness. He testified that his mother was "mad" that he mentioned her forgetfulness. He explained that Mrs. Constance's mother, who was still alive at the time of trial, suffered from Alzheimer's disease.

Gerard testified to an August 31, 2020 incident that led to Mrs. Constance's admission to an inpatient behavioral health center. On that date, his wife, Sheri Constance ("Sheri"), met with Kellie at Mrs. Constance's home to create a schedule to provide 24-hour supervision for Mrs. Constance. Gerard testified that Mrs. Constance became angry, walked outside, and keyed Sheri's car. He stated Mrs. Constance threatened to commit suicide on that day and that the police were

called to the home. He stated that Mrs. Constance was taken to the emergency room, and was subsequently transferred and admitted to Oceans Behavioral Center.

Gerard testified that, while his mother was admitted at Oceans Behavioral, he and his wife went to Mrs. Constance's home. He noticed some items out of place and he decided, to protect his mother's home, to change the locks to the home while she was admitted at Oceans Behavioral. He testified that Oceans Behavioral would not provide him with any information regarding Mrs. Constance's care or ultimate discharge. Thereafter, he first learned that Mrs. Constance had been discharged from Oceans Behavioral when he received a phone call from Elderly Protective Services informing him that Mrs. Constance and her friend had initiated an abuse report against him. He testified that his mother subsequently filed a restraining order against him based on "very absurd, untrue" allegations.[4]

Gerard testified that he attempted to call Mrs. Constance on numerous occasions but the phone did not even ring, and it appeared as though his number had been blocked. Gerard testified that he has never been verbally abusive to his mother. He testified that his reason for filing the petition for interdiction was to protect his mother from people trying to take advantage of her, including her neighbors and his sister, Kimberly. He stated that he did not take any of his mother's money for his own use and he did not take a salary for managing the rental properties.

Gerard testified that after his father's death, Dr. Fernandez advised that he should contemplate the possibility of Mrs. Constance moving in with him and Sheri. However, Gerard testified that after the elder abuse reports and the

---

[4] The record reflects that Mrs. Constance filed a "Petition for Protection Abuse" against her son, Gerard, on September 14, 2020, alleging verbal, emotional, and mental "elderly abuse" and claiming that Gerard intimidates her, has a GPS device tracking her phone, has blocked her family and friends' phone numbers from her cell phone, and that he frequently curses, screams, and verbally abuses her. The court granted a temporary restraining order that expired November 13, 2020.

temporary restraining order his mother filed against him, he backed out of a contract to purchase a larger home for her to move into with him and his family. When questioned about this possible living situation, Gerard testified that his mother had made many stipulations for a house that would meet her "standards" and she had clearly relayed her desire for privacy.

Gerard stated that he and his sister, Kimberly, co-owned a bicycle store that their father sold to them after he graduated high school. He testified that Kimberly stole approximately $200,000.00 from his father's company more than 20 years earlier, and at that time their father had given Kimberly the ultimatum to either return the money or leave, and she chose to leave. Gerard testified that he does not like his sister and had not spoken to her since 2003. He testified that he has learned his mother is paying Kimberly's car note and Kimberly is transferring money online from Mrs. Constance's account to her own account each month.

Gerard testified that his mother still pays for his gym membership, two years after the filing of the petition for interdiction, but he is "working on" correcting that error. He testified however that he has transferred some money online to his mother's account to reimburse her. He also testified that he remains in possession of rent money from tenants that he still owes his mother. Gerard testified that at the time of trial he had not spoken with his mother in approximately two years.

Kellie, Mrs. Constance's granddaughter and Kimberly's daughter, testified that she and Mrs. Constance, who she referred to as "Granny," were very close and Mrs. Constance was "like a mother" to her. She testified that, prior to August of 2020, she had helped facilitate Mrs. Constance's doctor's appointments, communicating with doctors by email to schedule appointments and follow-up with medical care.

Kellie testified that she and Mrs. Constance spent a lot of time together and she noticed a slight mental decline approximately one year before Mr. Constance

passed away. She stated that she and Mrs. Constance would go to La Madeleine regularly for lunch, and she noticed that Mrs. Constance began repeating stories and conversations during their outings. She further testified that in December 2019, during the period in which Mr. Constance was hospitalized at Ochsner Hospital, Mrs. Constance had been unable to find her parked vehicle at the Ochsner Hospital parking lot on more than one occasion. She also testified that Mrs. Constance lost her "gate key" to her home, and the family subsequently found the gate key in the dog treat bin. She further testified that, before he passed away, Mr. Constance asked Kellie to "keep an eye" on Granny because her "memory's getting really bad."

Kellie also testified that Mrs. Constance allegedly could not recall that she had made plans to spend the night at Kellie's house on the nights preceding Hurricanes Laura and Marco so that she would not be alone. Kellie testified that when she went to her grandmother's house to pick her up, Mrs. Constance informed her that she was not going with her and she did not recall agreeing to go to Kellie's house.

Kellie testified that Gerard adjusted Mrs. Constance's cell phone so that he could track Mrs. Constance's cell phone location. Kellie explained that Gerard took this action because of a past incident involving her great-grandmother, Mrs. Constance's mother, who became disoriented while driving with the family unable to locate her.

Kellie testified that in 2020, Mrs. Constance also began missing or canceling doctor's appointments. She testified that she communicated with Dr. Fernandez, who recommended that Mrs. Constance undergo a neuropsychological evaluation. Kellie testified that the medical providers thereafter informed her that Mrs. Constance had been diagnosed with Alzheimer's disease and Dr. Fernandez told her at that point that Mrs. Constance should not be unsupervised during the day to

ensure her safety, and was eating properly and taking her medications. Kellie testified that Mrs. Constance communicated clearly and repeatedly to her and to Sheri that she did not want to be placed in a nursing home.

Kellie also discussed an August 31st, 2020 incident, which occurred after Sheri had stayed overnight at Mrs. Constance's house. While Sheri and Kellie were discussing the schedule of who would provide 24-hour care for Mrs. Constance, Mrs. Constance got up and went outside. After a few minutes, Kellie went outside to look for Mrs. Constance and discovered her keying Kellie's car. Mrs. Constance at that point began walking quickly away from Kellie, and entered a neighbor's home. Kellie stated that she and Sheri contacted both the police and Dr. Fernandez's office to inform the doctor of the situation. Kellie testified that Mrs. Constance became very upset, crying out that she wanted to die. Dr. Fernandez eventually spoke with the police, who escorted Mrs. Constance to the emergency department for an evaluation, which eventually led to Mrs. Constance's admission to Oceans Behavioral. Kellie testified that after her grandmother was admitted to Oceans Behavioral, she did not have any communication with the facility and was not informed of her grandmother's status there. Kellie stated that she has not spoken with her grandmother since August 31, 2020.

Kellie also testified concerning her relationship with her mother, Kimberly. She testified that her relationship with her mother ended in 2013, because she did not agree with her mother's lifestyle and habit of using boyfriends for personal financial gain. She testified that she was not surprised that her mother had returned to Louisiana, "[b]ecause Paw was out of the equation and Granny was declining and she could manipulate her easily. She's manipulated me in the past." She stated that she did contact her mother through Facebook after she learned her mother intended to move back to Louisiana, and informed her mother that she could visit

with Mrs. Constance, but should plan to get a hotel and was not welcome to stay in Mrs. Constance's house.

Kimberly, Mrs. Constance's daughter, testified that she moved from Sarasota, Florida in October 2020, at Mrs. Constance's request, to live with and care for her mother after her father passed away. She acknowledged that between 2004 and her father's death in January 2020, she had very little communication with either of her parents other than the annual birthday or holiday text communications. She testified that her mother contacted her while she was admitted at Oceans Behavioral, after Mrs. Constance had been served with the petition for interdiction. Kimberly testified that her mother was "frightened" that Gerard and Kellie planned to put her in a nursing home.

Kimberly testified that she worked as a nutritionist in Florida and, upon hearing from her mother, immediately quit her job to move to Louisiana to care for her mother. She moved into her mother's home in October 2020, and has not obtained new employment since she moved to Louisiana. Kimberly testified that her mother pays for her car insurance and cell phone bill, any food or groceries and prescriptions she needs, and her mother agreed to do so because Kimberly quit her job, sold her home, and moved to Louisiana upon her mother's request to come help take care of her. She testified that she helps her mother in any way that she needs help, and has arranged for a sitter to stay at the house approximately four to five hours a day, five days a week.

Kimberly testified to her belief that an interdiction is unnecessary because "a lesser means is working." She testified that her mother "irons her clothes, washes her clothes. Puts her cloth[es] on, feeds herself, cooks her meals, decides what she wants from the stores, buys groceries." She testified that her mother just turned 80 years old, and her mother cut her own birthday cake with a large knife and served cake to her friends and family who celebrated her birthday with her.

Kimberly acknowledged that her mother needs help with managing the rental properties. When questioned as to whether her mother suffers from memory loss or forgetfulness, Kimberly responded "Yes, of course occasionally… ." She stated that her mother "needs help with her rental properties but as far as a lot of her day-to-day life she makes a lot of her own decisions." Kimberly testified that her mother's inability to handle the rental properties is not due to her infirmity or memory issues, but rather because her father always handled the properties and Mrs. Constance had no knowledge of how to handle them and "doesn't want to be bothered" with them. She opined that an interdiction would be "extreme" and unnecessary for Mrs. Constance. She stated that it would be her mother's wish to live in her own home with Kimberly, as she has since October 2020.

Kimberly testified that at some point when suffering from a urinary tract infection, Mrs. Constance did have hallucinations; she stated that Mrs. Constance thought she saw Gerard and that she was frightened that Gerard was "coming to get her," to put her in a nursing home. She recounted that around that time, Mrs. Constance had observed an email communication from Kellie to Mrs. Constance's doctor, asking whether a doctor referral letter was needed to refer or place Mrs. Constance in a nursing home facility. Kimberly testified that she spoke with Mrs. Constance's doctor and confirmed that the one-time hallucination was related to the urinary tract infection.

When questioned about Mrs. Constance's finances, Kimberly responded that she noticed Gerard had been using three of Mr. Constance's credit cards, after his death, and transferring money out of Mrs. Constance's bank account to make payments on those cards. She further testified that Gerard had been collecting rents from the rental properties and depositing the funds into his personal account, until he was court-ordered to put them into a separate account. She testified that he

collected $22,000 in rent over a year-long period, but only paid $4,000 in utilities or expenses for Mrs. Constance in that period.

Mrs. Lisa Pretus ("Mrs. Pretus") testified at trial that she had lived directly next-door to Mrs. Constance for twelve years. She testified to observations of interactions between Gerard and his mother during the period since Mr. Constance's death in January 2020. She stated that on one occasion, Mrs. Constance asked Mrs. Pretus to come over to help her with some possums in her shed, and Gerard became "very, very upset that she called [Mrs. Pretus]. And he got mad and angry and started throwing things and just cursing and screaming. He was just furious." Mrs. Pretus testified that she was "flabbergasted" by the whole interaction. She also testified to repeatedly observing Mrs. Constance ask Gerard to stop using the "F" word in her house.

Mrs. Pretus testified that Gerard came to her house after the possum incident and asked her to stop going over to Mrs. Constance's house, telling her that Mrs. Constance was sick and referring to Mrs. Constance as a "demented bitch." Ms. Pretus also discussed an incident during which she drove Mrs. Constance to a Wendy's drive-through to get a hamburger; she stated that Gerard tracked them down and "blocked everybody in the parking lot" because he wanted to talk to them, as "he didn't want me [Mrs. Pretus] with her [Mrs. Constance] and [asking] why was she out."

Mrs. Pretus testified that thereafter she asked Mrs. Constance where her daughter Kimberly was living, and Mrs. Pretus took it upon herself to "try to find this woman to tell her what was going on" because she was fearful of the way

Gerard treated Mrs. Constance.[5] She testified that Mrs. Constance is "very afraid" of Gerard.[6]

Sheri, Gerard's wife, testified at trial that she regularly spent time with Mrs. Constance for approximately six years after she and Gerard married. She testified that over time, she has noticed a slow decline in Mrs. Constance's memory functioning. She testified that she has never seen Gerard yell at his mother, and that Gerard loves his mother. She testified that, prior to trial in the courtroom, she observed Mrs. Constance and Gerard hugging and crying.

In July 2020, approximately 6 months after Mr. Constance's death, neuropsychologist Dr. Anneliese Boettcher evaluated Mrs. Constance upon Gerard and Kellie's recommendation and Dr. Fernandez's referral. Upon evaluation, Dr. Boettcher reported significant deficits in memory and diagnosed Mrs. Constance with Major Neurocognitive Disorder due to "Alzheimer's, probable" with a recommendation that Mrs. Constance be reevaluated in six to twelve months. Dr. Boettcher conducted a battery of tests, with many results in areas of recall, memory, and executive functioning being in the "exceptionally low" range. Other areas including "working memory" however reflected results within average limits. In July 2020, Dr. Boettcher recommended that Mrs. Constance put into place certain legal protections, including:

> She should consider designating a durable power of attorney for healthcare and finances, completing advanced directives for healthcare decisions, and estate planning (e.g., finalizing a will) at this time. I recommend meeting with an attorney who specializes in trusts and estates to ensure everything is handled properly.

---

[5] Mrs. Pretus testified that she has never received any money from Mrs. Constance. She testified that, several years ago, her daughter cut Mrs. Constance's grass on occasion, and her daughter was paid for that service. She further testified that her husband has also cut Mrs. Constance's grass, and has never been paid for doing so.

[6] Mrs. Pretus stated that she had called Child Protective Services to report Gerard's behavior with his daughter. She testified that she has a degree in education, special education, behavior disorders, and child psychology, and she found Gerard's behavior toward his daughter to be abusive. She indicated that, had she observed Gerard's behavior in her work context, she would have been obligated to report.

Concerning her Activities of Daily Living ("ADL"), however, Dr. Boettcher's July 2020 report indicated that Mrs. Constance can do activities "independently and without difficulty." The report referenced that Mrs. Constance does not cook frequently since her husband passed away, but that she does still cook her own meals and can cook well.

In January 2022, Dr. Kevin Bianchini, the court-appointed neuropsychologist, evaluated Mrs. Constance and thereafter issued his report on June 20, 2022. During his evaluation, Dr. Bianchini also performed a battery of tests, interviewed multiple family members, and reviewed past medical records, including Dr. Boettcher's 2020 report. Dr. Bianchini found that Mrs. Constance felt extreme pressure to perform well and communicated her feelings that her son, Gerard, was attempting to interdict her and place her in a nursing home. At the conclusion of the testing, Dr. Bianchini diagnosed Mrs. Constance with dementia and found "some cognitive impairment." Dr. Bianchini, however, specifically disagreed with Dr. Boettcher's 2020 Alzheimer's diagnosis. Dr. Bianchini reviewed Dr. Boettcher's 2020 report and records and found that, after the passage of the one and a half to two-year period of time since Dr. Boettcher's evaluation, Mrs. Constance did not experience "the deterioration that would be expected to occur in a rapidly deteriorating condition like Alzheimer's... ." Although Dr. Bianchini acknowledged that Mrs. Constance has "some cognitive difficulties," he opined that Mrs. Constance "still has the capability to express her preferences and make decisions," and that his evaluation results "do not support a need for interdiction."

The Elderly Protective Services ("EPS") records[7] were also introduced at trial and reflect that EPS substantiated allegations made as early as February 2020

---

[7] EPS is an adult protection agency as defined in La. R.S. 15:1503(4)(a) and established through the Governor's Department of Elderly Affairs in accordance with La. R.S. 36:151.

through September 2020 against Gerard that he moved large sums of money from Mrs. Constance's Capital One account to pay on a credit card not owned or used by her; deleted and blocked certain phone numbers from Mrs. Constance's phone; removed a computer and important documents from Mrs. Constance's home; removed $80,000 from a Capital One account; changed the locks on Mrs. Constance's home without her permission; took $27,000 from a lock box in the home; took his deceased father's truck and never returned it; and that Gerard can be verbally abusive.[8]

At the conclusion of trial, the trial judge took the matter under advisement. On February 14, 2023, the trial court issued a judgment of full interdiction, finding that Mrs. Constance is "unable to make reasoned decisions regarding the care of her person and property, or to communicate those decisions, and that her interests cannot be protected by less restrictive means than a full and permanent interdiction."

In her written reasons for judgment, the trial judge found, in pertinent part:

The evidence shows that while Mrs. Constance was living alone, she lost or misplaced credit cards, her gate opener, her cell phone, and has forgotten where she parked her vehicle on more than one occasion. She also has forgotten conversations and visitors she has had and also repeats conversations. She has also forgotten making evacuation plans for hurricanes and signing powers of attorney. Additionally, her behavior had become erratic at times. Specifically, in 2020, Mrs. Constance missed or cancelled several doctor's appointments without explanation and Kellie had to reach out [to] the providers and reschedule. There was also evidence that Mrs. Constance was not taking her medications as prescribed. Even Kimberly testified that one of the reasons for moving in with her mother was to ensure she took her medications properly and to make sure she attended all of her scheduled doctor's appointments. Also in 2020, during what was testified to as a heated discussion, Mrs. Constance threatened self-harm and keyed Kellie and Sheri's vehicles before fleeing down the street to a neighbor's home. After some discussions with her treating physician, Mrs. Constance voluntarily went to the emergency room and was admitted for psychiatric evaluation. She was subsequently transferred to Oceans Behavioral Hospital where she remained for 10 days

---

[8] The EPS records state that: "Carol's deceased husband was a tyrant and her son, Gerard, is taking over where he left off."

pursuant to a physician's emergency certificate. Dr. Bianchini notes that given the dynamic during her marriage, Mrs. Constance developed a "passive coping style" and that this is probably a lifelong strategy for her. Put another way, Mrs. Constance avoids conflict and typically bends to the suggestions of others. Her husband's control over the family finances has put Mrs. Constance at a great disadvantage in being able to manage her own affairs, causing her to rely heavily on others to perform these tasks. This includes but is not limited to paying household bills, taking her medications, attending medical appointments, and especially the management of the rental properties. Additionally, in less than a years time, Mrs. Constance signed at least four different Powers of Attorney. It is clear to the Court that as Dr. Bianchini stated, "she is vulnerable to undue influence."

The trial court acknowledged that "it appears that Mrs. Constance is taking her medications, attending all medical appointments, and has maintained the same power of attorney in favor of Kimberly since December 2020, but that does not diminish the fact that Mrs. Constance's dementia deprives her of reasoned decision-making." Although Mrs. Constance did not testify at trial, the trial court stated that "the Court feels that Mrs. Constance is also attempting to conceal or lessen the severity of her dementia" and found that "Mrs. Constance is not consistently capable of making reasoned decisions."

The Court further determined that "given the tension and history presented, it would not be appropriate to appoint Gerard, Kellie, or Kimberly as curator over Mrs. Constance's finances or person." Thus, the trial court appointed Louisiana Guardianship Services, Inc. ("LGSI"), a nonprofit curatorship services program, to serve as curator pursuant to La. R.S. 9:1031.

It appears that the trial judge did not inform or notify the parties of her intent to contact LGSI. Further, the record reflects that the February 14, 2023 written judgment appointing LGSI was the first notice provided to the parties of LGSI's involvement as curator. In her written reasons for judgment, the trial judge stated that "[t]he Court contacted Louisiana Guardianship Services, Inc. and it was determined that Mrs. Constance was a candidate for their services." The record does not contain any evidence of LGSI's possible appointment discussed in the

record and does not reflect what conversation, if any, the trial judge had with LGSI concerning Mrs. Constance's need for interdiction.[9]

Mrs. Constance has appealed the trial court judgment, challenging the judgment of full interdiction under La. C.C. art. 389. Specifically, Mrs. Constance contends that the trial court erred (1) in concluding that less restrictive means were not available, despite concluding that Mrs. Constance's health and legal affairs had been stable for more than two years at the time of trial; (2) in rendering judgment based on a "feeling" that Mrs. Constance attempted to conceal the extent of her dementia; and (3) in appointing a third-party curator, LGSI, without notice to the parties and when Mrs. Constance is not indigent or in need of LGSI's services. We address each related assignment of error below.

## LAW AND ANALYSIS

### Judgment of Full Interdiction

We first address Mrs. Constance's first two assignments of error challenging the judgment of full interdiction rendered pursuant to La. Civil Code article 389. La. C.C. art. 389 sets forth that:

> A court may order the full interdiction of a natural person of the age of majority, or an emancipated minor, who due to an infirmity, is unable consistently to make reasoned decisions regarding the care of his person and property, or to communicate those decisions, and whose interests cannot be protected by less restrictive means.

Thus, only if a person is consistently unable to make reasoned decisions regarding both her person *and* property, *or* to communicate those decisions, is she a candidate for full interdiction under La. C.C. art. 389. Interdiction is a harsh remedy and requires proof that the person to be interdicted is mentally incapable of administering his or her estate *and* is unable to take care of his or her person. *In re*

---

[9] As discussed in more detail herein, the Judicial Code of Conduct specifically prohibits ex parte communications. Although this Court agrees with LGSI's ultimate appointment in this case, we cannot condone ex parte communications between the trial court and a potential curator without notice to the parties and affected individuals.

*Smith*, 94-262 (La. App. 5 Cir. 11/16/94), 646 So.2d 1052, 1060, *writ denied sub nom. In re Interdiction of Smith*, 94-2996 (La. 2/3/95), 649 So.2d 407 (emphasis added).

To establish that interdiction is necessary, the party seeking an interdiction has the burden of proving the need for interdiction by clear and convincing evidence. La. C.C.P. art. 4548. Because the determination of whether to order interdiction is a finding of fact, an appellate court will not set aside the trial court's finding in the absence of manifest error or a clearly wrong determination. *Matter of "LRB"*, 22-140 (La. App. 5 Cir. 12/28/22), 355 So.3d 715, 721.

A judgment of interdiction is, in the final analysis, "a pronouncement of civil death without the dubious advantage of an inscription thereof on a tombstone." *In re Benson*, 15-0874 (La. App. 4 Cir. 2/24/16), 216 So.3d 950, 955, *writ denied sub nom. In re Interdiction of Benson*, 16-0314 (La. 4/8/16), 188 So.3d 1052. Under Louisiana jurisprudence, interdiction is considered one of the most powerful involuntary legal regimes that may be applied to a person. Interdiction and Continuing Tutorship—Rules on Interdiction, 2 La. Prac. Est. Plan. § 5:174 (2023-2024 ed.), citing *Sanders v. Dupree*, 53,296 and 53,297 (La. App. 2 Cir. 3/4/20), 293 So.3d 138. Its effect has been described as a "radical displacement of legal identity: it nullifies the interdict's own actions, and transfers his decision-making power to a surrogate." Jeanne Louise Carriere, *Reconstructing the Grounds of Interdiction*, 54 La. L. Rev. 1199, 1199 (1994); *Converse v. Dicks*, 179 La. 339, 154 So. 17 (1934). Thus, importantly, "interdiction cannot be used as a matter of convenience,[10]" for family seeking to interdict an aging family member. Rather, the effect of interdiction, *i.e.*, the legal displacement of self, must be balanced

---

[10] *In re Smith, supra,* citing *Interdiction of Lemmons,* 511 So.2d 57, 59 (La. App. 3rd Cir. 1987).

against the respect due to an aging individual's liberty, autonomy, and identity or dignity.

Full interdiction is warranted only when a person's interests cannot be protected by less restrictive means. A person's interests can be protected by less restrictive means if, for example, his interests: (1) are currently being protected by other legal arrangements, including a procuration, mandate, or trust, or (2) could be protected by other legal arrangements, including a limited interdiction. La. C.C. art. 389, cmt. (e); *Matter of Interdiction of Keith*, 17-1573 (La. App. 1 Cir. 6/22/18), 2018 WL 3080456. An individual is a candidate for full interdiction only if the individual is *consistently* unable to make reasoned decisions regarding the care of *both* his person *and* his property, *or* to communicate those decisions. *See* La. C.C. art. 389. If a person is unable consistently to make reasoned decisions regarding their person or property, *or any aspect of either their person or property*, then that person is a candidate for a limited interdiction. *See* La. C.C. art. 390; *Matter of Interdiction of Keith*, *supra*.

A court may order the limited interdiction of a natural person of the age of majority, or an emancipated minor, who due to an infirmity is unable consistently to make reasoned decisions regarding the care of his person **or** property, **or** any aspect of either, or to communicate those decisions, and whose interests cannot be protected by less restrictive means. La. C.C. art. 390 (emphasis added). A judgment of limited interdiction confers "upon the limited curator only those powers necessitated by the interests of the limited interdict to be protected through limited interdiction." La. C.C.P. art. 4551(B). Under this Article, any right not specifically restricted in the judgment of limited interdiction is retained by the limited interdict. La. C.C. art. 390, cmt. (a); *see also* Interdiction and Continuing Tutorship—Rules on Interdiction, 2 La. Prac. Est. Plan. § 5:174 (2023-2024 ed.).

Upon review of the evidence presented at trial as outlined above, we find that the trial judge was manifestly erroneous in her finding that Mrs. Constance is in need of a full interdiction pursuant to La. C.C. art. 389. While the testimony and evidence presented supports the trial court's factual finding that Mrs. Constance suffers from some level of dementia and is subject to undue influence, which inherently puts her property at risk, the evidence also unquestionably demonstrates that Mrs. Constance is in fact capable of managing her personal affairs and activities of daily living.

The evidence presented at trial—including the most recent 2022 neuropsychological evaluation from Dr. Bianchini—reflects that Mrs. Constance has no difficulty consistently managing her daily activities. The August 31, 2020 emergency room records, immediately preceding the Oceans Behavioral admission, state that Mrs. Constance "has poor short term memory," but is "capable of tending to all of her own ADL's [Activities of Daily Living]." The testimony of each witness who testified at trial commonly demonstrates that Mrs. Constance is able to consistently manage her usual and mundane daily affairs—she irons her clothes, dresses herself, goes grocery shopping by herself and uses a debit card to pay for her groceries, manages to watch streaming services such as Netflix on her home television, chooses which meals to eat and cooks homemade meals for herself and others. We find the trial judge's determination that Mrs. Constance is incapable of managing the day-to-day activities of her person is manifestly erroneous.

Upon review of the record on appeal, we find that the record supports the trial court's factual findings that Mrs. Constance is incapable of consistently handling her financial, legal, and medical affairs. However, we cannot say that the record supports a judgment of full interdiction under La. C.C. art. 389. Rather, we find that the evidence supports a need for a limited interdiction. Accordingly, we

reverse the trial court judgment of full interdiction and render a judgment of limited interdiction only as to Mrs. Constance's legal, financial, and medical affairs.[11] *See In re: Keith, supra.*

However, given that more than 15 months have passed since the date of trial on Gerard's petition for interdiction and considering that we by way of this opinion have vacated the judgment of full interdiction and rendered a new judgment of limited interdiction, we remand this matter to the trial court for a post-judgment hearing to consider whether there has been any "material change in the functional ability" of the interdict, Mrs. Constance, since the date of trial, as set forth under C.C.P. art. 4569. *See* La. C.C.P. art. 4569[12], Cmt. (b).[13]

Further, considering the medical evidence in the record reflects that dementia can be a progressive disease, we order the trial court to expeditiously evaluate Mrs. Constance's current medical condition and condition of daily living by obtaining an updated evaluation from the court-appointed neuropsychologist Dr. Bianchini, as well as an updated report from LGSI fully explicating upon Mrs. Constance's current circumstances and capabilities, as well as upon any changes

---

[11] Because we reverse the trial court judgment imposing a full interdiction, we pretermit discussion of Mrs. Constance's assignment of error that the trial court erred in rendering judgment based on a "feeling" that Mrs. Constance attempted to hide the extent of her dementia. Moreover, this Court reviews the correctness of the judgment on appeal, not the reasons for judgment. *See Claiborne Med. Corp. v. Siddiqui*, 12-759 (La. App. 5 Cir. 2/28/13), 113 So.3d 1109, 1112. Nevertheless, we point out that the record reflects that the trial judge participated in this trial via ZOOM and was not physically present in the courtroom during trial. Moreover, Mrs. Constance did not testify at trial; therefore, it is unclear, based on the record before us, whether the trial judge was able to observe Mrs. Constance in the courtroom during trial or upon which basis the trial judge could have rendered a determination on Mrs. Constance's credibility.

[12] La. C.C.P. art. 4569 provides:
A. A curator with responsibility for affairs of the interdict shall file an account annually, upon the termination of his office, and at any other time ordered by the court. A curator with responsibility for the person of an interdict shall file a personal report describing the location and condition of the interdict annually, upon the termination of his responsibilities, and at any other time ordered by the court. At the time of filing, the curator shall send copies of any required account or personal report by first class United States mail postage prepaid to the undercurator and any successor curator. The provisions of Articles 4393 and 4398 shall apply to accounts by curators.
B. The court may appoint an examiner at any time to review an account or personal report of the curator, to interview the interdict, curator, or undercurator, or to make any other investigation. At any time, the court may appoint an attorney to represent the interdict.

[13] Comment (b) to Article 4569 provides: "The curator's personal report should, among other things, describe whether there has been a material change in the functional ability of the interdict to care for his person and affairs"

observed in Mrs. Constance's mental and physical condition over the fifteen-month period since LGSI's appointment as curator. The trial court is further ordered to expeditiously conduct a hearing—with the presence of LGSI and Mrs. Constance's counsel, providing the parties the opportunity to present evidence as to Mrs. Constance's current circumstances, including but not limited to her ability to consistently make reasoned decisions in her activities of daily living—to determine if any new evidence would necessitate modification of the limited interdiction imposed herein to meet Mrs. Constance's current legal, medical, financial, and personal needs, and to reassess her ability to manage her personal circumstances and activities of daily living.

Appointment of LGSI

On appeal, Mrs. Constance contends that the trial court erred in appointing a third-party independent entity, LGSI, as curator under the facts of this case. Specifically, Mrs. Constance complains that the trial judge failed to afford the parties any notice of or opportunity to oppose LGSI's possible appointment. She further challenges LGSI's appointment on the ground that the statutory language provided in La. R.S. 9:1031 permits LGSI, as a nonprofit curatorship service, to represent only indigent adult interdicts. Thus, Mrs. Constance contends that because she is not indigent, the trial court erred as a matter of law in appointing LGSI as her curator.[14]

We first consider whether the statutory language provided in La. R.S. 9:1031 limits LGSI to serve as curator for only indigent adults. The appropriate starting point for statutory interpretation is the language of the statute itself. *State v.*

---

[14] In his appellee brief, Gerard asks this Court to appoint him as curator. Gerard however did not Answer the appeal or file a separate appeal and, thus, we are precluded from addressing his argument on appeal. *See Aldwell v. Meadowcrest Hospital, Inc.*, 07-376 (La. App. 5 Cir. 10/30/07), 971 So.2d 411, 416. Moreover, we find no error in the trial court's determination that, given the contentious relationship between Gerard and his mother, Gerard would not be an appropriate curator for Mrs. Constance. Further, the record may support a factual finding that Gerard owed his mother money at the time of trial and, thus, he may be disqualified to serve as a curator under La. C.C.P. art. 4561(B)(2).

*Expunged Record (No.) 249,044,* 03-1940 (La. 7/2/04), 881 So.2d 104, 107; *In re Louisiana Health Service and Indemnity Company,* 98-3034 (La. 10/19/99), 749 So.2d 610, 615. When a law is clear and unambiguous and does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. *See* La. R.S. 1:4; *Louisiana High Sch. Athletics Ass'n, Inc. v. State*, 12-1471 (La. 1/29/13), 107 So.3d 583, 606.

Courts have a duty in the interpretation of a statute to adopt a construction which harmonizes and reconciles it with other provisions dealing with the same subject matter. La. C.C. art. 13; *Nucor Steel Louisiana, LLC v. St. James Par. Sch. Bd.*, 20-247 (La. App. 5 Cir. 11/5/21), 330 So.3d 1226. All laws pertaining to the same subject matter must be interpreted *in pari materia* ..." *Acurio v. Acurio*, 16-1395 (La. 5/3/17), 224 So.3d 935, 938, quoting *Pierce Foundations, Inc. v. Jaroy Construction, Inc.*, 15-785 (La. 5/3/16), 190 So.3d 298, 303. The meaning and intent of a law must be determined by a consideration of the law in its entirety. *Whitley v. State ex rel. Bd. of Sup'rs of Louisiana State Univ. Agr. Mech. Coll.*, 11-0040 (La. 7/1/11), 66 So.3d 470, 475.

The legislature is presumed to have acted with deliberation and to have enacted each article in light of the preceding law involving the same subject matter and court decisions involving those articles. *See* La. R.S. 24:177(C); *Rebel Distributors Corporation, Inc. v. LUBA Workers' Comp.*, 13-0749 (La. 10/15/13), 144 So.3d 825, 836. Additionally, courts must give effect to all parts of a law and, if avoidable, should not give an interpretation that makes any statute within a section or any part of an individual statute superfluous or meaningless. *Id.;* *Succession of Brandt*, 21-310 (La. App. 5 Cir. 9/22/21), 362 So. 3d 670, 674, *writ granted*, 21-01521 (La. 1/19/22), 330 So.3d 1074, and *aff'd*, 21-01521 (La. 9/1/22), 346 So.3d 765.

In 1992, The Louisiana legislature enacted Acts 1992, No. 820, § 1, eff. July 8, 1992, which incorporates La. R.S. 9:1031-1034 pertaining to "Nonprofit Curator and Continuing Tutor Programs." The statute at issue, La. R.S. 9:1031 provides:

> A. Notwithstanding any law to the contrary, a nonprofit curatorship service program, organized and operating pursuant to the corporation laws of this state, may be appointed the curator for an indigent adult in need of full or limited interdiction or may be appointed the continuing tutor for an indigent in need of continuing tutorship, if no individual seeks the appointment and meets the qualifications of curator. No appointment of a curator or continuing tutor pursuant to this Part shall confer authority to terminate life support or a pregnancy.
>
> B. Any party to an interdiction or tutorship proceeding, including the state of Louisiana and its political subdivisions, may petition the court to appoint the program as curator or continuing tutor.
>
> C. The court may hear such evidence as it deems necessary in order to determine whether the program is an appropriate entity to serve as curator or continuing tutor, including the sufficiency of a bond secured and maintained by the program. If the court desires to make such an appointment, it shall deliver to the program notice of the prospective appointment and information regarding the person in need of program services.
>
> D. Within ten days from delivery of the notice, the program shall notify the court in writing of the decision to provide or decline the rendering of program services.
>
> E. Upon election of the program to provide program services, the court shall appoint the program as curator or continuing tutor for the person in need of such services.
>
> F. Notwithstanding any law to the contrary, in cases wherein the program is appointed curator or continuing tutor, the appointment of an undercurator or undertutor is not required.

On appeal, Mrs. Constance argues that La. R.S. 9:1031(A)—stating that a nonprofit curatorship program "may be appointed the curator for an indigent adult"—prohibits LGSI from representing nonindigent adult interdicts. However, a review of the plain statutory language reflects that the only paragraph that contains the word "indigent" is Paragraph A, which references that a nonprofit curatorship program "may" provide services to indigent adult interdicts. This language operates to grant permission to render services, meaning that LGSI *may*

be appointed to serve as curator for an indigent interdict. *See Fernandez v. City of Kenner*, 21-550 (La. App. 5 Cir. 12/8/21), 335 So.3d 951, 956, quoting La. R.S. 1:3 (the word 'shall' is mandatory and the word 'may' is permissive). However, this language is permissive in nature and is not, in turn, a bar prohibiting its application in other circumstances. *Id.*

This interpretation is further supported when considering the language provided in the surrounding statutes in the same subject matter. *See* La. R.S. 9:1032-1034. For instance, La. R.S. 9:1034 stands for the proposition that LGSI, and other not-for-profit programs or entities, are exempt from the payment of filing fees or court costs under certain circumstances. Specifically, La. R.S. 9:1034 states:

> The program shall be exempt from the payment of filing fees or taxing of court costs in connection with any judicial proceeding related to its performance of program services for indigent adults.

A plain reading of La. R.S. 9:1034's statutory language demonstrates that LGSI is *only exempt* from paying filing fees or court costs when it performs services "in connection with any judicial proceeding related to its performance of program services for indigent adults." If the law contemplated under La. R.S. 9:1031(A) that all nonprofit curatorship programs would be restricted to only provide services to indigent adults, there would be no need to limit La. R.S. 9:1034's exemption for paying filing fees or court costs to those instances when services are rendered "in connection with" or on behalf of indigent adults. This provision would be rendered meaningless if we interpreted La. R.S. 9:1031 to only permit LGSI to render services to indigent adults.

Moreover, as argued by LGSI in its *Amicus* brief, many non-profits operate based on payment from those individuals who can afford to pay. Restricting LGSI's services to only indigent adults would diminish or obliterate the funds

needed to continue to operate and be able to provide services to indigent adults.

Accordingly, we find no merit in Mrs. Constance's argument that La. R.S. 9:1031 restricts LGSI to appointment as curator only for indigent adults.

Next, Mrs. Constance argues on appeal that the trial court erred in appointing LGSI without notice to the parties or the opportunity to oppose LGSI's appointment. We agree. The record reflects that, after the December 7, 2022 interdiction trial, the trial judge took the matter under advisement. On February 14, 2023, the trial judge issued a judgment placing Mrs. Constance under a "full and permanent interdiction" and further appointing LGSI as Mrs. Constance's curator. The record demonstrates, however, that the parties were never informed of the possibility of LGSI's appointment prior to the February 14, 2023 written judgment. Further, the record reflects that the trial court "contacted" LGSI ex parte and without notice to the parties.[15]

We find that the trial judge's ex parte communication with LGSI after trial in this contested case is prohibited under the Judicial Code of Conduct. Judicial Code of Conduct Cannon 3(A)(6) provides in part: "Except as permitted by law, a judge shall not permit private or ex parte interviews, arguments or communications designed to influence his or her judicial action in any case, either civil or criminal." Cannon (3)(A)(6) further provides: "Where circumstances require, ex parte communications are authorized for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits, provided the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication."

While in very limited and infrequent or emergent circumstances, a trial court may be permitted to engage in ex parte communications, this case does not present

---

[15] The written reasons for judgment state that "[t]he Court contacted Louisiana Guardianship Services, Inc. and it was determined that Mrs. Constance was a candidate for their services."

any of those circumstances. There is no basis in this record upon which the trial judge should have engaged in any ex parte communication with LGSI before giving the parties the opportunity to object or contest LGSI's appointment. Considering that the appointment of a curator in this case was a contested issue between the parties, we find that the trial court erred in communicating with and appointing LGSI ex parte without any notice to the parties.

We next turn to consider whether the trial court's appointment of LGSI without a hearing was proper. We find that the statutory language provided in La. R.S. 9:1031 contemplates that the court conduct a hearing to consider whether a nonprofit third-party curatorship service program, such as LGSI, is the appropriate person to serve as curator in a case. However, the statutory language appears to grant the court discretion to determine if an evidentiary hearing is necessary under the facts of each particular case.

La. R.S. 9:1031 states:

> (C) The court *may hear such evidence as it deems necessary* in order to determine whether the program is an appropriate entity to serve as curator or continuing tutor, including the sufficiency of a bond secured and maintained by the program. If the court desires to make such an appointment, it shall deliver to the program notice of the prospective appointment and information regarding the person in need of program services.

The statutory language referencing that the court "may hear evidence" suggests that an evidentiary hearing is contemplated under the statute to determine whether LGSI or other nonprofit curatorship service programs would be an appropriate curator. Nevertheless, the permissive "may" language permits the court to decline to hold a hearing as to a nonprofit curatorship programs abilities to serve as curator in certain cases. For instance, in those cases involving indigent adult interdicts with no other individuals qualified or seeking to be appointed as curator, an evidentiary

hearing may not be necessary or warranted to appoint a nonprofit curatorship service such as LGSI. *See* La. R.S. 9:1031(A).

However, in this case, the issue of who would serve as curator was a contested issue and multiple parties and individuals sought to be named Mrs. Constance's curator. As stated above, we find that the trial judge erred in failing to provide the parties with notice of LGSI's possible appointment and, thus, deprived them of the opportunity to object or present evidence to challenge LGSI's appointment. Moreover, we cannot say that the trial judge engaged in best practices in failing to hold an evidentiary hearing specifically provided for and contemplated under La. R.S. 9:1031(C). Nevertheless, under the facts of this case and in the interest of justice, we find that the trial judge's appointment of LGSI as an independent entity— based on the evidence presented at trial at that time—was proper. Thus, we find that any error related to LGSI's appointment, such as the trial judge's ex parte communication with LGSI and failure to hold an evidentiary hearing pursuant to La. R.S. 9:1031(C), is ultimately harmless in this case. We therefore affirm the trial court's appointment of LGSI as Mrs. Constance's curator.

**DECREE**

For the reasons provided herein, we reverse the trial court judgment of a full interdiction and render a judgment of limited interdiction, with the interdiction limited to Mrs. Constance's legal, financial, and medical affairs. We further remand this matter to the trial court to conduct an evidentiary hearing as set forth herein.

Specifically, we order the trial court on remand to obtain an updated evaluation from the court-appointed neuropsychologist, Dr. Bianchini, as to Mrs. Constance's current medical and daily living conditions. We further

order the trial court to obtain an updated report from LGSI in compliance with La. C.C.P. art. 4569 fully explicating upon Mrs. Constance's current circumstances and capabilities, as well as upon any changes observed in Mrs. Constance's mental and physical condition over the thirteen-month period since LGSI's appointment as curator. We further order the trial court to expeditiously conduct a hearing—with the presence of LGSI and Mrs. Constance's counsel—to determine if any new evidence would necessitate modification of the limited interdiction imposed herein to meet Mrs. Constance's current legal, medical, financial, and personal needs, and to reassess her ability to manage her personal circumstances and activities of daily living.

**JUDGMENT OF FULL INTERDICTION REVERSED; JUDGMENT OF LIMITED INTERDICTION RENDERED; REMANDED WITH INSTRUCTIONS**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **MARCH 22, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 23-CA-318

**E-NOTIFIED**

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE DANYELLE M. TAYLOR (DISTRICT JUDGE)
VINCENT F. WYNNE, JR. (APPELLEE)
DYLAN T. LEACH (APPELLANT)
JENNIFER C. DEASY (AMICUS)

ANNA M. SINGLETON (APPELLEE)
RANDALL A. SMITH (APPELLANT)
STEVEN E. BAIN (AMICUS)

MATTHEW A. SHERMAN (APPELLEE)
JASON D. ASBILL (AMICUS)

**MAILED**

COLIN LEONARD (AMICUS)
ATTORNEY AT LAW
2121 NORTH CAUSEWAY BOULEVARD
SUITE 172
METAIRIE, LA 70001

R. GARY HIGGINS, JR. (APPELLEE)
SHANNON K. LOWRY (APPELLEE)
WHITNEY H. GERMANY (APPELLEE)
ATTORNEYS AT LAW
410 NORTH JEFFERSON AVENUE
COVINGTON, LA 70433

NICHOLAS R. VARISCO (APPELLEE)
ATTORNEY AT LAW
ONE GALLERIA BOULEVARD
SUITE 1100
METAIRIE, LA 70001